## UNITED STATES v. FALLBROOK PUBLIC UTILITY DIST. et al.

### No. 1247–SD

United States District Court
S. D. California, S. D.

Dec. 9, 1952.

District (to be herein referred to as Fallbrook) and the Santa Margarita Mutual Water Company (to be referred to as Santa Margarita) and the State of California, as intervenor, briefed and requested the Court's opinion thereon as a means of simplifying the issues and reducing the time for preparation for trial.

Following the filing of the second opinion and the refusal of the Court to grant a continuance requested by Fallbrook, it secured an order from the Court of Appeals for the Ninth Circuit staying the proceedings as to it, until that Court heard an Order to Show Cause which questioned the right of the writer to hold the separate trial as to some defendants at Los Angeles in the Central Division, because the courtroom facilities in the Southern Division at San Diego were occupied with other trials. So the writer, with the acquiescence and approval of Santa Margarita and the State of California, proceeded to try the issues as to this defendant and intervenor who were not made parties to the proceeding before the Court of Appeals.

Raymond deS. Shryock, Commander, U. S. Navy, Chula Vista, Cal., and David W. Agnew, Special Asst. to Atty. Gen., for plaintiff.

W. B. Dennis, Fallbrook, Cal., for defendant Santa Margarita Mutual Water Co.

Edmund G. Brown, Atty. Gen., of State of Cal., by George G. Grover, Deputy Atty. Gen. of the State of Cal., for State of California.

Due to the extensive pre-trial order and the cooperation of counsel, the presentation of testimony and the arguments were completed in record time. And the writer expresses publicly his thanks to counsel in the case for demonstrating that even a water case can be tried expeditiously in California, if there is cooperation between Court and counsel.

YANKWICH, Chief Judge.

This litigation has been the subject of two prior opinions.[1] The first opinion dealt with the development of the law on riparian rights in California and the contentions of the parties as disclosed by the pleadings. The second one dealt with certain questions of law, which, following a pre-trial order, filed August 25, 1952, the Government and the defendants Fallbrook Public Utilities

The prior opinions stated in detail the Court's attitude on the major questions of law involved in this case. So this opinion will deal chiefly with facts. A fundamental factor adverted to in the second opinion[2] is that the Government of the United States, by reason of its acquisition of lands through purchase, after the institution of condemnation proceedings, and through actual letters of cession[3], insists on absolute control of the lands so acquired against the exercise of any of the police

---

1. United States v. Fallbrook Public Utility District, D.C.Cal.1951, 101 F.Supp. 298; United States v. Fallbrook Public Utility District, D.C.Cal.1952, 108 F. Supp. 72.

2. United States v. Fallbrook Public Utility District, D.C.Cal.1952, 108 F.Supp. 72, Part VII.

3. United States Constitution, Art. I, Sec. 8, Cl. 17.

powers of the State. Nonetheless, by stipulation between the Government and the State of California, dated November 29, 1951, and by the Order of this Court, embodied in the pre-trial order, *the rights to the use of water which the Government seeks to determine by this lawsuit are to be measured in accordance with the law of California*. The pre-trial order is attached marked Appendix A.

■ And in assaying the facts, *the criteria to be used are those applied by the higher courts of California.*

## I

### The Beneficial Test Use

One of the difficulties one encounters in a case of this character is that where a State has developed a body of law on a subject, the tendency is to consider it as a whole. However, the water law of California, so far as it relates to riparian rights, *cannot be so considered*. For, as the first opinion on the subject and as the decision of the Supreme Court of the United States dealing with the subject indicate [4], the people of California, in 1928, adopted an amendment to the Constitution of the State which modified the riparian rights as they had been previously declared by the courts of California. So when trying a case of this character, it is important to re-examine and reject every decision ante-dating 1928 which goes counter to the philosophy of water rights embodied in the 1928 amendment. The chief change the amendment brought into the water law of California consisted of engrafting upon *every water right and every mode of diversion* the doctrine of beneficial use.

In one of the first cases dealing with the effect of the amendment, the Supreme Court of California summed up its effect in this language:

"The limitations and prohibitions of the constitutional amendment now apply to every water right and every method of diversion. Epitomized, the amendment declares:

"1. The right to the use of water is limited to such water as shall be reasonably required for the beneficial use to be served.

"2. Such right does not extend to the waste of water.

"3. Such right does not extend to unreasonable use or unreasonable method * * * of diversion of water.

"4. Riparian rights attach to, but to no more than so much of the flow as may be required or used consistently with this section of the Constitution.

"The foregoing mandates are plain, they are positive, and admit of no exception. They apply to the use of all water, under whatever right the use may be enjoyed. The problem is to apply these rules in the varying circumstances of cases as they arise." [5]

Similar declarations have been made repeatedly since.[6] And the doctrine has been applied to an underground stream.[7]

■ Subject to this limitation, the riparian owner is entitled to the flow of the stream, as limited by the correlative rights of other owners. The riparian owner may acquire prescriptive rights in addition to his riparian rights.[8]

In one of the cases already referred to,

---

4. United States v. Gerlach Live Stock Co., 1950, 339 U.S. 725, 70 S.Ct. 955, 94 L. Ed. 1231.

5. Peabody v. City of Vallejo, 1935, 2 Cal. 2d 351, 367–368, 40 P.2d 486, 491.

6. Gin S. Chow v. City of Santa Barbara, 1933, 217 Cal. 673, 699–704, 22 P.2d 5; Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist., 1935, 3 Cal.2d 489, 525, 45 P.2d 972; City of Lodi v. East Bay Municipal Utility Dist., 1936, 7 Cal. 2d 316, 338–339, 60 P.2d 439; Carlsbad Mutual Water Co. v. San Luis Rey De-

velopment Co., 1947, 78 Cal.App.2d 900, 911, 178 P.2d 844; Stevinson Water Dist. v. Roduner, 1950, 36 Cal.2d 264, 270, 223 P.2d 209.

7. Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 445, 90 P.2d 537, 91 P.2d 105; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 555, 81 P.2d 533; City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 926–927, 207 P.2d 17.

8. Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist., 1935, 3 Cal.

the Supreme Court of California, after analyzing the cases decided since the 1928 amendment, has stated the scope of its limitation on riparian rights and the rights to surplus and waste waters in this manner:

"In the cases referred to it was established that by the changes in the law the right to use the waters of rivers and streams of the state has been limited to a reasonable beneficial use; that the riparian owner has a prior and paramount right to this use and if necessary is entitled to the full natural flow of the stream or its equivalent undiminished in quantity and unimpaired in quality. The riparian owner is safeguarded in this right by the constitutional amendment. But the amendment also provides that 'riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section * * *'. This provision clearly means that when the law has guaranteed to the riparian owner the use of the waters of the stream to the full extent to which he may put the same for all present and prospective useful and beneficial purposes, and has made available to him the means of protecting the rights so guaranteed, he has received the full measure of benefit and protection to which he is entitled, and can claim no more.

"There are waters in the rivers and streams of the state to which the riparian right first attaches. The rights of other lawful users on the stream also rightfully attach. In addition there are in many of the rivers and streams of the state great volumes of water which pass on unused to the sea or to an inland drainage basin. In a real sense this excess water is a great natural resource available for the benefit of this and future generations, as the occasion for its use may arise. These excess waters constitute the public waters of the state to be used, regulated and controlled by the state or under its direction." [9]

In the case involving the former owners of the Ranch which the Government acquired by purchase, the nature of the usufructory rights of the riparian owners is stated in this manner:

"The riparian does not 'own' the water of a stream, he 'owns' a usufructory right—the right of reasonable use of the water on his riparian land when he needs it. Gould v. Eaton, 117 Cal. 539, 49 P. 577, 38 L.R.A. 181. If one riparian has no present need for water the others may use it all. The lower riparian cannot secure an injunction against the upper riparian unless the upper owner is using an excessive portion of the waters of the stream resulting in actual damage to the lower proprietor. * * * The same principles apply to underground waters. * * * Moreover, it is also well established that the underground and surface portions of the stream constitute one common supply." [10]

Santa Margarita has not diverted any water. So we need not concern ourselves with the academic problem whether a lower riparian owner is entitled to enjoin an upper appropriator.[11] Rather do we direct our attention to the problem of what the Government by riparian ownership and adverse use has shown itself to be entitled to under the cases just announced which, summed up, state the law to be that Santa Margarita as an appropriator is entitled

2d 489, 565, 45 P.2d 972; Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 445, 90 P.2d 537, 91 P.2d 105; Dykzeul v. Mansur, 1944, 65 Cal.App.2d 503, 507, 150 P.2d 958; Larsen v. Apollonio, 1936, 5 Cal.2d 440, 444, 55 P.2d 196; City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 926–927, 207 P.2d 17.

9. Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 445, 90 P. 2d 537, 547.

10. Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 555, 81 P.2d 533, 560.

11. See, Oliver v. Robnett, 1922, 190 Cal. 51, 55, 210 P. 408; Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App.2d 900, 914.

only to any surplus or waste waters which exist in the stream. If there is no surplus water, after the Government is allowed the full measure of its riparian rights, then any diversion by Santa Margarita under its appropriation would, of necessity, damage the Government. For it is quite evident from the experience of the failure of the water system at the ammunition depot and the intrusion of salt water into some of the wells, that an additional diversion would harm the Government. And, while it is the rule that the injunctive process is not used to allay one's fears, the Government is entitled, at least, to a declaration that diversion would result in injury.

## II

## The Character of the Santa Margarita and Its Basin

In the pre-trial order the character of the Santa Margarita River System and its drainage areas was agreed to, and the following facts are gathered from it.

### A. *The Santa Margarita River System and Its Drainage Area*

The Santa Margarita is a non-navigable intermittent stream having a drainage area of 740 square miles, 192 square miles of which are situated in San Diego County, California, and 548 square miles in Riverside County, California. The Santa Margarita watershed is semi-arid.

Temecula Creek and Murrietta Creek have their junction at the head of Temecula Gorge and there form the Santa Margarita River.

Rising on the eastern slope of the Coastal Range in San Diego County, near the present site of the Palomar Observatory, Temecula Creek proceeds in a northerly and westerly direction a distance of approximately fourteen miles where it enters the Pauba Grant of the Vail Estate. After entering the Pauba Grant, it flows northwesterly through a portion of the grant known as Nigger Valley, for a distance of a little more than three miles. It then enters a narrow canyon on the Pauba Grant known as Nigger Canyon. In a state of nature, Temecula Creek flowed through Nigger Canyon for a distance of approximately two miles. Situated across the channel of Temecula Creek at the upper end of Nigger Canyon on the Pauba Grant, in the Northwest Quarter of the Northwest Quarter, Section 10, Township 8 South, Range 1 West, is the Vail Dam, creating a reservoir with a capacity of approximately 50,000 acre-feet.

Below the Vail Dam, the Temecula Creek traverses Pauba Grant for a distance of approximately eleven miles.

Leaving the Pauba Grant of the Vail Estate, Temecula Creek continues its westerly course across the Little Temecula Grant of the Vail Estate for a distance of approximately one and a half miles. That stream then enters the Temecula Grant of the Vail Estate, flowing a distance of approximately two miles.

Immediately before leaving the Temecula Grant of the Vail Estate, Temecula Creek has its confluence with Murrietta Creek and below that point is known as the Santa Margarita River.

The Santa Margarita River then enters Temecula Gorge, a narrow canyon through which it flows southerly and westerly for a distance of approximately nine miles. Though Temecula Creek, prior to its junction with Murrietta Creek, flows alternately as a surface and sub-surface stream, the Santa Margarita River throughout Temecula Gorge in the state of nature is a surface stream.

Shortly after leaving Temecula Gorge, the Santa Margarita River enters Camp Joseph H. Pendleton, the Marine Corps Training Base. It then flows in a generally southwesterly direction through Camp Pendleton—Naval Ammunition Depot—United States Naval Hospital lands for a distance of about twenty-one miles to the Pacific Ocean. For the full twenty-one miles the course of the river lies entirely within the property of the United States of America.

The Santa Margarita River within the boundaries of the above-mentioned military establishments is an intermittent stream.

## B. Tributaries of the Santa Margarita River

There are several tributaries of the Santa Margarita River from tidewater to its head waters.

De Luz Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a westerly and southerly direction to its confluence with the Santa Margarita River several miles within the boundary lines of Camp Pendleton.

Fallbrook Creek, an intermittent stream, rises east and south of the Santa Margarita River. Most of its length is within the boundaries of Camp Pendleton and the United States Naval Ammunition Depot and it has its present terminus in Lake O'Neill, an artificial reservoir which lies within the Camp Pendleton area. In the state of nature, Fallbrook Creek flowed into the Santa Margarita River.

Sandia Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a southerly direction to its confluence with the Santa Margarita River at a point a short distance above the easterly boundary of Camp Pendleton.

Rainbow Creek is an intermittent stream which rises east and south of the main channel of the Santa Margarita River and proceeds in a northerly and westerly direction to its confluence with that river a short distance above Sandia Creek.

Murrieta Creek, an intermittent stream, has its source north of the Temecula Grant of the Vail Estate and traverses the lands of that grant before it joins Temecula Creek to form the Santa Margarita River. Junction of the streams takes place at a point about a half mile east of the westerly boundary of Temecula Grant of the Vail Estate and a short distance east of Temecula Gorge. It has several tributaries, most important of which is Cottonwood Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate. Santa Gertrudis Creek, a tributary of Murietta Creek, is an intermittent stream rising on the Pauba Grant of the Vail Es-

tate, traversing lands in other ownership before crossing a portion of the Temecula Grant prior to its confluence with Murrieta Creek. Warm Springs Creek, an intermittent stream, rises east of Murietta Creek and flows into that stream just below the town of Murrieta.

Penjango Creek, an intermittent stream, is tributary to Temecula Creek, rising south of that stream and joining it a short distance upstream from the junction of the stream last mentioned with Murrieta Creek. From its source to confluence Penjango Creek traverses a portion of the Little Temecula Grant, and then flows across the Temecula Grant of the Vail Estate, the property upon which its junction with Temecula Creek takes place.

Other affluents of Temecula Creek are Lancaster Creek and Arroyo Seco, both of which are intermittent in character, flowing only during periods of high precipitation and entering Temecula Creek above Nigger Canyon.

## C. Subterranean Basins Underlying Santa Margarita River

From its head waters to the Pacific Ocean, the watershed of the Santa Margarita River System is underlaid with numerous subterranean basins. They differ greatly in size and capacity.

Underlying the military establishments in question within the Santa Margarita River watershed are one or more underground basins or segments of basins, commonly known as:

1. Upper or O'Neill Basin or Segment;

2. Chappo or Home Ranch Basin or Segment;

3. Ysidora Basin or Segment.

Throughout the ground-water basin or basins within the watershed of the Santa Margarita River underlying Camp Pendleton are numerous wells of varying depths in the alluvium. The surface and subsurface area and the character and type of the deposits penetrated by the wells, so far as the same are known to the United States of America, have been analyzed.

D. *United States Geological Survey Records*

The United States Geological Survey has maintained and published records of the following principal gauging stations within the watershed of the Santa Margarita River:

| Stream | Station | Period of record |
|---|---|---|
| Santa Margarita River | Ysidora | From February 19, 1923, to date |
| Santa Margarita River | Fallbrook | " November 25, 1924, to date |
| Temecula Creek | Temecula (Railroad) Canyon | " January 30, 1923, to date |
| Temecula Creek | Nigger Canyon | " January 30, 1923, to date |
| Murietta Creek | Temecula | " October 1, 1930, to date |

In addition, measurements have been taken for diversions at O'Neill Ditch and at other places on the Santa Margarita River System.

*E. Additional Features*

In addition to the facts just referred to, the following additional facts are established by the evidence.

Below the Vail Dam, Temecula Creek traverses a highly porous area where that stream, except during periods of high run-off, disappears into the Temecula Basin. In a state of nature, Temecula Creek customarily again becomes a surface stream at a distance of about three miles from the present site of the Vail Dam. Presently, however, due to the control of the stream arising from the mentioned dam and the draft upon Temecula Basin by the Vail Estate, Temecula Creek reappears as a surface stream at a great distance from the mouth of Nigger Canyon dependent upon the draft and the period elapsing between releases from Vail Reservoir.

Within Camp Pendleton the Santa Margarita River does not flow as a continuous surface stream, but, during the dry season of the year, the stream customarily and ordinarily sinks into the highly porous ground water basin underlying Camp Pendleton and other military establishments. When that basin has been filled, the Santa Margarita River ordinarily comes to the surface some two or three miles from tide-water. In a state of nature it continues then to the Pacific Ocean as a stream of diminishing volume.

From its head waters to the Pacific Ocean, the Santa Margarita River passes over and through numerous ground basins. The water in those basins is contained by bedrock or other impervious material. The basins are filled with alluvial deposits of varying degrees of porosity. The basins differ greatly in size and in capacity. The waters of the Santa Margarita River, in its course through the valley, penetrate and fill the voids of the porous alluvium. When the water of the stream sinks to bedrock or the other impervious material comprising the beds of the basins, in which the detrital material lies, it spreads out laterally filling the basins. When completely charged, the waters of the basins support the surface stream and progress slowly downstream through the permeable material.

Ground water basins of the character described underlies Temecula Creek in portions of Oak Grove Valley; and Lancaster Creek in Lancaster Valley. Temecula Basin, one of the largest in the entire watershed of the Santa Margarita River, is located on the property of the Vail Estate. This large T-shaped alluvial deposit area has the stem of the T along the main channel of Temecula Creek for a distance of approximately eight miles, varying in width from two-thirds of a mile to a mile and a half. That area of the Temecula Basin immediately below the present site of Vail Dam is comprised of coarse, highly porous material and is known as the "out wash". Into that "out wash", except in periods of extremely heavy precipitation, Temecula Creek sinks. About three miles below the "out wash", the Temecula Basin becomes an artesian area from which Temecula Creek again emerges as a surface stream.

The right arm of the T-shaped alluvial basin extends northward underlying Murrieta Creek for a short distance above that stream's confluence with Temecula Creek. The left arm of the T-shaped Temecula alluvial basin extends southward beneath Penjango Creek.

Underlying Murrieta Creek and separated from the Temecula Basin is another large alluvial basin known as the Murrieta Basin. That is comprised of valley-fill similar to that found in the other basins.

Due to the existence of granitic rock immediately underlying the stream from approximately the point of confluence of Temecula Creek with Murrieta Creek to the mouth of the Temecula Gorge, the Santa Margarita River in the state of nature is a surface stream. That granitic underlay of the stream continues from the point mentioned across the boundary of Camp Pendleton to a point approximately one and one-half miles below the confluence of De Luz Creek with the Santa Margarita River. At that point the stream opens out into a rather broad alluvial flood plain. That alluval area extends from the point last mentioned to tidewater, constituting a large ground-water basin. That ground-water basin is comprised of a relatively coarse and loose porous valley-fill at the upstream end comparable to the "out wash" area of the Temecula Basin above described. Approaching the ocean the character of the alluvium becomes increasingly fine and tight.

The alluvial ground-water basin underlying the Santa Margarita River within Camp Pendleton and the other military establishments is geologically and hydrologically interconnected, comprised, however, of three separate segments which lend themselves readily to arbitrary subdivisions. Their designation as three separate components already appears.

## III

### The Military Establishment

A brief description of the military establishments may be given. This, also, is taken from the Agreed Facts in the Pretrial Order.

### A. Camp Joseph H. Pendleton

It is the function of Camp Joseph H. Pendleton to provide housing and training facilities for units of the Armed Forces, to conduct training of units of the Armed Forces in amphibious warfare and experimental work with landing craft, landing vehicles, tracked and affiliated equipment and the development thereof; to conduct combat training of the various units of the United States Marine Corps, including air-ground support coordination, and use of artillery, tanks and other equipment used in the conduct of modern amphibious and land warfare. In addition to the aforementioned activities, it is the function of Camp Pendleton to provide logistic support for units of the United States Marine Corps together with material maintenance and storage facilities, for supplies and equipment and to house and train replacements for subsequent assignment to various operating units of the United States Marine Corps.

### B. United States Naval Hospital

The United States Naval Hospital, with a capacity of approximately 1550 beds, established at Camp Joseph H. Pendleton, provides medical and hospital services to personnel of the Armed Forces, their dependents and other authorized personnel at 83 Naval shore activities located in the Southern California area and provides medical and hospital care to personnel of units of the United States Fleet.

### C. United States Naval Ammunition Depot.

The United States Naval Ammunition Depot, Fallbrook, California, provides facilities for the storage, segregation, reconditioning and issuing of ammunition for operating units of the United States Fleet and the United States Marine Corps and maintains ammunition stocks for shore establishments of the United States Navy located in the Southern California area. In addition, this Naval Ammunition Depot stores and ships ammunition for use by combat elements of the United States Navy and the United States Marine Corps.

The Santa Margarita River, in its course, traverses virtually the length of Camp Pendleton—Naval Ammunition Depot—United States Naval Hospital lands from east to west for a distance of approximately 21 miles. There are no users below Camp Pendleton on the Santa Margarita River for the United States of America owns the lands on both banks of that stream from the point where the Santa Margarita River enters upon the military establishments just mentioned to the point of confluence of the river with the Pacific Ocean, except for the easement for right of way which the Atchison, Topeka and Santa Fe Railroad owns.

## VI

### Present and Prospective Water Needs

This brings us to a consideration of the water supply of the Santa Margarita River. Excepting a small riparian acreage owned by Fallbrook, the two chief riparian owners on the Santa Margarita River are the Vails and the Government. As between them, the measure of their rights is the stipulated judgment dated December 27, 1940, as agreed to by stipulation entered into in this case July 8, 1952.

The court in the case between the Government's predecessor in interest and the Vails [12] has stated that the normal flow of the river is not sufficient to supply the full needs of the riparians. As the rights between riparians are correlative, the stipulated judgment determines the division of the water between them. And if, after such division of water, there is no surplus, the appropriators, whether they are bound by the judgment or not,[13] simply have nothing to appropriate.

The evidence shows that the Vails claimed more water than the stipulated judgment gave them. In this respect, the case follows the usual pattern in judgments of this character where the court, finding that the supply is inadequate, makes a division which curtails each side to some extent. Here, the parties, after the first judgment was reversed, agreed on the division. So the Government's predecessor in interest benefitted by the stipulated judgment, and the Government will continue to benefit as the expanding needs of the Vails unfold.

The acquisition of the lands by the Government was through two condemnation proceedings. The first acquisition in point of time was a tract of land consisting of 9147.55 acres. The decree on the declaration of taking was entered in the Southern Division of this court on January 21, 1942. This land is the place upon which the Ammunition Depot is located. The next acquisition was 122,202.72 acres. The decree in that case was dated December 31, 1942.

A small parcel of 1676.58 acres was acquired in another proceeding by a decree dated December 23, 1943. Another parcel of 1574.61 acres, which was in the public domain, was transferred to the Navy on August 8, 1945. A small parcel consisting of 112.11 acres located in Orange County was acquired by deed dated February 8, 1949.

The Santa Margarita River flows through the large parcel. The river enters the area at the northeasterly corner of Camp Pendleton, and from there it meets the boundary of the Naval Ammunition Depot to the south and forms the boundary of the Naval Ammunition property and Camp Pendleton property and continues to flow in a southwesterly direction along the boundary of the Naval Ammunition Depot into Camp Pendleton and from there on through the Camp into the Pacific Ocean. From the point at which it leaves the boundary of the Naval Ammunition Depot, the lands embrace the river on each bank until it reaches the ocean. The stipulated judgment states, as does the pre-trial order, that for the full twenty-one miles the course of the river lies entirely within the property of the United States of America.

This land is subject to an easement to a 100-foot right of way granted by the Government's predecessor to the Santa Fe Rail-

---

12. Rancho Santa Margarita v. Vail, supra, 11 Cal.2d at pages 534, 556, 81 P. 2d at pages 550, 561.

13. City of Los Angeles v. Hunter, 1909, 156 Cal. 603, 105 P. 755; City of Los Angeles v. City of Glendale, 1943, 23 Cal. 2d 68, 80, 142 P.2d 289.

road which does not affect the riparian rights of the Government.

Of this acreage, some 37,882.2 acres lie in the watershed of the Santa Margarita River and are riparian to the river, i. e., they are contiguous to the stream and have not been separated by separation of interest or change of ownership of lands lying between or upstream from the thread of the stream.[14]

Of the Government's riparian acreage in the watershed, 18,648.3 acres can be irrigated profitably according to the standards recognized by the Soil Conservation Service of the United States Department of Agriculture. The riparian acreage of the Vails is 40,575, of which 29,410 acres can be profitably irrigated. These lands are within the watershed of the stream and drain into it. They have access to the stream and constitute one continuous piece, no part of which has ever been severed from its riparian rights.

At the present time, the Vails have only 4500 acres under irrigation, but their engineers are working on plans for the development of the irrigation system. On the basis of an irrigable acreage of 29,410, it was the opinion of the expert, H. M. Hall, who had worked for the Vails over a long period of years, that the duty of water of the Vail lands would be

"79,514 acre-feet which could be profitably applied to the irrigable land on the ranch if that much water were available."

On the same basis, the same and other Government experts computed that the 18,648.-3 acres of irrigable land of the Government in the watershed would call for a duty of water of 69,237 acre-feet of water per year. In this we agree.

Under California law, subject to the correlative rights of other riparians, the rights of the riparian owner are paramount as to the water he puts to actual reasonable beneficial use, but his rights against appropriators are paramount also as to his prospective reasonable beneficial use. The latter envisages future uses to which the lands may be adapted.[15] While a court might make a declaration as to such maximum use, until there has been actual use, any water which remains above the present actual use may *temporarily* be subject to appropriation. So it becomes important to determine the present actual use of water by the Government in its military establishment.

In so doing, we repeat that a military use being considered a substitute use, the Government is entitled to the maximum actual use being made *at the present time.* In determining the amount, the Government would be entitled to the equivalent for present military use of the maximum potential future agricultural use. And assuming, as it has been stated, that when the maximum

14. Constitution of California, Art. XIV, Sec. 3; California Water Code, Sec. 101; Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App. 2d 900, 911, 178 P.2d 844.

15. The extent of lands having riparian status is determined by three criteria: "1. The land in question must be contiguous to or about on the stream, except in certain cases not now involved. *The length of frontage is an immaterial factor.* Thus in Joerger v. Mt. Shasta Power Corp., 214 Cal. 630, 7 P.2d 706, a 40-acre tract with but a 250-foot contact with the stream * * *. See, also, Omnes v. Crawford, 202 Cal. 766, 767, 262 P. 722. Clearly under these cases, and others that could be cited, it *is access to the stream, and not whether all sur-* *face drainage from the area in question, drains directly into the stream at the point of access, that determines the riparian status of the land.* These cases clearly refute the so-called 'surface drainage theory'. * * *

"2. The riparian right extends only to the smallest tract held under one title in the chain of title leading to the present owner. Boehmer v. Big Rock Irrigation Dist., 117 Cal. 19, 48 P. 908. * * *

"3. The land, in order to be riparian, must be within the watershed of the stream. Anaheim Union Water Co. v. Fuller, 150 Cal. 327, 88 P. 978, 11 L.R. A.,N.S., 1062." Rancho Santa Margarita v. Vail, supra, 11 Cal.2d at pages 528–529, 81 P.2d at page 547. (Emphasis added)

population of the military establishment reaches 105,000, the Government might need 20,500 or more acre-feet per year, this would still be less than the maximum potential of its irrigable lands, and as to that quantity of water, its rights are paramount, although the unused portion may, in the meantime, be subject to appropriation if it can be captured and impounded.

■ Nevertheless, as of today, the Government is only entitled to the undisturbed flow of the water which it can use for the present population of its military establishments.

## V

## The Government's Use

We consider the evidence in the record relating to the extent of the basic water supply and the use of the water by the military establishment at Camp Pendleton.

### A. "Normal" Flow

Attention has been called to the fact that the Supreme Court in the litigation between the Government's predecessor in interest and the Vails had stated that the normal flow of the river is not adequate for the two main riparian owners.

I think the word "normal", in cases of this character, is used in its dictionary sense implying the usual, the ordinary, as distinguished from the extraordinary.[16] It is defined in the dictionary as

"The ordinary, usual condition, degree, quantity or the like; average, mean."[17]

When you are dealing with elements which operate periodically, normality implies an average over a particular number of years. Thus, the dictionary defines "normal" from a "meteorological" point of view in this manner:

"Of a meteorological element average over many years at a particular place and for a definite time, a certain day or some other specified period."[18] The legal definitions accord with these.[19] Thus, where the court had before it a contract which related to the "normal high water line", it held that the word was used in the dictionary sense as meaning the normal or average height the water reached at the highest stage during the year. The Court said:

"The use of the word normal may not be ignored and applying it to the word 'high', we must conclude the contract did not mean the highest level to which water naturally raised prior to 1924 for a sufficient length of time to make a mark, but the normal or average height the water reached at the highest stages during the years. The evidence merely as to the highest line the water may have reached, did not thus establish the 'normal high line.'"[20]

This accords with the ordinary speech habits of men, and also with the pattern in arid states. When we speak of "normal" rainfall, we speak of the average usual rainfall established by meteorological data over a course of years. In actual practice we all know that, at times, the normal is not reached for a period of years, and, on the contrary, periodically, we have high precipitation. And as we are dealing with a stream in a dry country, and a channel through which the flow varies from dry years to flood years, and varies greatly during what is known as the rainy season from the normally dry season, it must be quite evident that when the court spoke of normal flow, it referred to the ordinary flow in the channel over a period of years, considering the fact that the Santa Margarita

16. Rancho Santa Margarita v. Vail, supra, 11 Cal.2d at pages 534, 556–568, 81 P.2d at pages 550–561, 562; Gin S. Chow v. City of Santa Barbara, 1939, 217 Cal. 673, 683–686, 22 P.2d 5.

17. Webster's New International Dictionary, 2d Ed., 1937, p. 1664.

18. Webster's New International Dictionary, 2d Ed., 1937, p. 1665.

19. See, Restatement, Torts, Sec. 302d, 443b; Sterling Cider Co., Inc., v. Hassett, 1 Cir., 1943, 133 F.2d 590, 591–592.

20. Payette Lakes Protective Ass'n v. Lake Reservoir Co., 1948, 68 Idaho 111, 125, 189 P.2d 1009, 1017. See, Hilbert v. City of Vallejo, 9 Cir., 1927, 19 F.2d 510, 511–512.

River is a flash flood stream, without a control structure.

B. *The Water Used*

Accurate measurements exist to show the actual use of water by the Government's establishment from the year 1943 to date. The yearly use is shown in the following chart:

Quantities of Water from the Santa Margarita River Historically Utilized Both Within and Without the Watershed by the United States of America

| Year | Within Ac. Ft. | Without Ac. Ft. | Total Ac. Ft. |
|---|---|---|---|
| 1943 | 5389 | 1591 | 6,980 |
| 1944 | 5298 | 1785 | 7,083 |
| 1945 | 6396 | 4332 | 10,728 |
| 1946 | 6160 | 3729 | 9,889 |
| 1947 | 6374 | 4350 | 10,724 |
| 1948 | 6894 | 4417 | 11,311 |
| 1949 | 6637 | 5008 | 11,645 |
| 1950 | 6407 | 4402 | 10,809 |
| 1951 | 6275 | 3983 | 10,258 |

This gives an average per year of 9,934 acre-feet. The needed average, on a present-day basis, is 11,000 acre-feet per year.

The testimony in the record warrants the conclusion that the use is reasonable; that, in fact, it is, in some respects, below what military authorities believe to be the actual needs of the three military establishments. One of the witnesses, a high ranking Marine Officer, testified that, in his opinion, the equipment and machinery at Pendleton is "filthy", because of lack of adequate water supply. It is a fair inference that the average use of military personnel in an establishment of this character should be at least 150 gallons per man per day. This minimum is not used, and the average at Pendleton is lower than the experts have declared to be reasonable for well-built suburban areas.

We are satisfied that the military authorities have husbanded the water resources well. They have limited strictly the use of water on their agricultural land. They have treated sewage and the affluent from the sewage treatments has been discharged into a lake where, after its being temporarily used for recreational purposes, it is released into the river basin in order to recharge it and thus increase the underground supply. No water is taken by the Government from the stream itself. All the water is from underground pumping through various wells located in the area. Of the water used by the Government, some has historically been used on irrigated lands lying outside the watershed. The maximum demand upon the Santa Margarita River which the Government is asserting as to them is indicated by the following table:

| Location | Areas (Acres) | Water Duty (Ac. Ft. /Yr.) |
|---|---|---|
| Stuart Mesa | 964.0 | 3770.0 |
| South Coast Mesa | 259.0 | 1036.0 |
| Total | 1223.0 | 4806.0 |

The pre-trial opinion discussed fully the question of acquisition of prescriptive rights by a non-riparian diversion such as one outside the watershed. We refer in the margin to some of the most recent cases asserting this doctrine.[21]

The undisputed record is that the use of water outside the basin began in 1938 by the Government's predecessor in interest, after a finding in the case which later resulted in a stipulated judgment,[22] that there was not water enough at normal flow to satisfy both riparian owners. In the circumstances, it matters not whether the use is by the lower riparian owner or an upper riparian owner. For the lower riparian owner, having put some of the

21. Larsen v. Apollonio, 1936, 5 Cal.2d 440, 55 P.2d 196; Crain v. Hoefling, 1942, 56 Cal.App.2d 396, 402, 132 P.2d 882; Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 734, 140 P.2d 798; Dykzeul v. Mansur, 1944, 65 Cal.App.2d 503, 507, 150 P.2d 958; Orchard v. Cecil F. White Ranches, Inc., 1950, 97 Cal. App.2d 35, 43–44, 217 P.2d 143.

22. Rancho Santa Margarita v. Vail, supra, Note 15.

water to non-riparian use, he has put the water to a hostile use against anyone, including appropriators who might have been entitled to it as surplus water.[23]

## C. *The Water Available*

The geological and hydrographic description of the Santa Margarita River and the basin has already been given. And reference has also been made to geological and other data available in Government and other official publications. Having set forth the use of water and the possible use by the two chief riparian owners, it becomes necessary to consider the supply available.

The Government's experts have presented charts and computations showing the water available in the basin from 1923 to 1952. In referring to quantities, the measure used is acre-foot. And an acre foot is defined by water and soil experts as that amount of water which would cover one acre-one foot deep. The amount is 43,560 cubic feet or 326,000 gallons. A cubic foot per second is a cubic foot each second. That amounts to a flow of two acre-feet in a twenty-four hour period. The acre-foot is volume, and the second foot is rate.

In attempting to reconstruct the flow of the stream, the Government experts have measured diversion through pumping and surface diversion. This for the reason that a subterranean basin as well defined as this basin is a part of a stream and an integral part of the water supply. The exhibits which embody the conclusion are rather lengthy. But a summary of them may be given by paraphrasing the language of one of the Government's experts, Paul F. Henderson.

In the first year, 1924–1925, the month of June shows that the reconstructed stream flow was approximately 1,000 acre-feet.

In the water-supply year 1925–1926, there was a fairly large flow occurring during the month of April, the reconstructed flow being approximately 14,500 acre-feet.

The next year 1926–1927 was one of the very heavy run-off years. The flood occurred in February, the total reconstructed flow being 81,700 acre-feet.

The years 1927–1928, 1928–1929, 1929–1930, 1930–1931 are all what might be termed minimum flow years with the average monthly flows in the river varying between 1,000 and 2,500 acre-feet per month.

In 1931–1932, in the month of February a small flood occurred with the reconstructed flow amounting to 31,680 acre-feet.

The years 1932–1933, 1933–1934, 1934–1935 were again low run-off years.

For the year 1935–1936, the reconstructed run-off would be approximately 7,500 acre-feet.

One of the largest run-off years occurred in 1936–1937, with a reconstructed flow of 56,030 acre-feet in February and 36,000 acre-feet in March.

This was followed by one of the largest single month run-offs, which occurred in March of the water supply year of 1937–1938, with a recorded or reconstructed flow of 106,400 acre-feet.

The years 1938–1939 and 1939–1940 had comparatively low flood flows in February.

The 1940–1941 year was another year of heavy flood flows. It showed a reconstructed flow of 53,570 acre-feet in March and 37,750 acre-feet in April.

The year 1941–1942 was a low flow. There was another full water supply year in 1942–1943, with floods occurring in the month of January, fairly heavy flow in February, and another heavy flow in March.

The drought period then became progressively worse with average flows during the year running from 1,000 to 1500 acre-feet.

From this study of the recorded diversions for a period of twenty-eight years, the conclusion is reached that

"the safe annual water supply at Camp Pendleton from the Santa Margarita River, with full usage of the subterranean basin, is 12,500 acre-feet annually."

23. Larsen v. Apollonio, 1936, 5 Cal.2d 440, 55 P.2d 196.

Even that figure could not be safely relied upon without the construction of a small equalizing reservoir at the DeLuz site. Such reservoir would not be used for storage, but would be installed to spread the flood flows out for such a period of time as the water could be introduced into the subterranean basin underlying the Camp Pendleton site.

During the period of extreme flow, there would be considerable spill from an equalizing reservoir allowing the water to spread out over the pumping area.

There is no such structure on the basin at the present time. The only dam structure is the Vail dam. The stipulated judgment between the Vails and the Government's predecessor in interest insures a minimum quantity of three second feet at the Temecula Gorge, which, flowing for twenty-four hours, would amount to six acre-feet per day. It was the opinion of the expert that, but for the requirement for this minimum flow at Temecula Gorge, very little, if any, water would reach Camp Pendleton during the summer season, with the exception of the heavy flood flows.

In order to prevent damage to the basin through intrusion of sea water, it is necessary to maintain a fresh-water barrier at the lower end of the pumping basin, which is estimated as 8000 acre-feet.

A glaring fact which stands out in the history of the water supply in this basin is that, at high flood time, large quantities of water run off in a very short period of time. Thus, in the year 1926–1927, of the 81,600 acre-feet for the month of February, 67,000 went through in one day. This type of flood occurred during the measured period some six or seven times. Thus, in 1932 and 1933, of the total run-off of 40,600 acre-feet, 31,200 was in the month of February. And of this amount, 12,000 acre-feet in one day,—February 16th. In 1936 and 1937, there was a run-off of 117,200 acre-feet, of which 92,000 ran off in two months, February and March. On February 7th, 22,000 ran off in one day. Of the 36,000 feet in March of that year, 10,000 occurred in one day,—March 16th. The water year of 1942–1943 showed a run-off of 74,270 acre-feet of which there were 32,700 acre-feet in January, with 19,000 acre-feet in one day,—January 23rd.

These facts are very significant. For the defendant's water expert has included these extraordinary run-offs in order to formulate the indefensible conclusion that they can be considered a part of the "normal" flow so as to show a greater water supply than testified to by the experts of the Government. This expert, Mr. Harold Conkling, by including the uncontrolled flood waters and making them a part of the available supply, and by postulating two reservoirs not yet built, in addition to the Vail reservoir, and *by assuming their existence and function over the entire twenty-eight year period,* reached the conclusion that, after deducting all the diversions of the riparians, there would have been brought up in the underground a surplus of some 9620 acre-feet.

In summing up this conclusion, the expert makes the following observations in one of his exhibits:

"This is the discharge into the ocean that would occur in a period of average precipitation with Camp Pendleton using water as in 1952 and after Vail and Fallbrook Reservoirs were fully operating.

"a. This diversion assumes Fallbrook Reservoir retains all water arriving at any time of year up to its capacity so that the only water passing are the spills when the supply exceeds capacity. If, however, the summer flows which would surely percolate in the Pendleton basins if not dissipated enroute were padded through the Fallbrook Reservoir, the average annual diversion would be about 10,-500 acre-feet instead of 12,460 and safe yield of Fallbrook Reservoir would be about 7000 acre-feet instead of 10,000. Discharge past Ysidora would be about 2000 acre-feet more, giving an annual average of about 11,600 instead of 9620.

"b. Diversion minus sewage return to basins."

I believe the conclusion is fanciful. It postulates the possibility that the court under its power to indicate an alternative solution could order the riparians to spend millions of dollars in constructing dams. There is no warrant in law for such action. The value of the opinion is further vitiated by the fact that the construction of these dams would not, of themselves, assure an increase in present water supply. They are a water expert's speculations as to what might have happened if, during a period of twenty-eight years, the flood waters had been stored and been used to replenish the underground. But as both Santa Margarita and the State contend that both cyclical and seasonal storage of riparian water is illegal,[24] this clearly represents a case of wishful thinking. For the court, in seeking another solution of the problem, cannot suggest a solution which is impossible because incompatible with the water law of the State, *which we are bound to apply.* The Government's experts have rejected as impractical a dam of the type envisaged by Mr. Conkling. The only type of dam or reservoir that they consider feasible on this stream which would assure a more uniform supply is an equalizing reservoir that would not be used for storage, but merely for the purpose of spreading the flood flows out for such period of time as the water could be introduced into the subterranean basin underlying the Camp Pendleton area. In this we agree. And, assuming that appropriators might construct such dam, we should not jeopardize the rights of the riparians in the vain hope that a generous appropriator might, after many years, achieve an adequate supply from an unnamed source.

■ Judgment and declaration quieting the title of the Government will be entered, in accordance with the views here expressed and the order embodying specific findings filed with this opinion.

### Order as to Findings

The above-entitled cause, heretofore tried, argued and submitted, is now decided as follows:

Upon the grounds stated in the Opinion filed herewith, Judgment and Declaration quieting Title of the Government will be entered. Such Judgment and Declaration to contain the following specific Findings.

1. Of the Government's acreage involved in this litigation, 37,882.2 acres lie in the watershed of the Santa Margarita River and are riparian to it.

2. Of this acreage in the watershed, 18,648.3 acres can be irrigated profitably according to the standards recognized by the Soil Conservation Service of the Department of Agriculture.

3. The riparian acreage of the Vails is 40,575 acres, of which 29,410 acres can be profitably irrigated. These lands are within the watershed of the stream and drain into it. They have access to the stream and constitute one continuous piece, no part of which has ever been severed from its riparian rights.

4. The Vails have, at the present time, 4500 acres under irrigation.

5. On the basis of an irrigable acreage of 29,410 acres, 79,514 acre-feet of water could be applied profitably to the irrigable Vail lands.

6. The 18,648.3 acres of irrigable land of the Government in the watershed would call for a duty of water of 69,237 acre-feet of water per year.

7. As to such prospective use, the Government is entitled to a declaration that its right to such water is paramount to those claimed by Santa Margarita under its applications dated October 4, 1946 and November 12, 1947.

8. As between the Government and the Vails, their correlative rights are to be determined according to the stipulated judgment entered in the case entitled Rancho Santa Margarita v. Vail, et al., No. 43850, Superior Court, San Diego County, on December 27, 1940, as agreed to by stipulation entered between the Government and the Vails on July 8, 1952.

9. The military use is a riparian use and the Government's paramount rights extend to the full measure of the capable

---

24. See Part III of Pre-trial Opinion in United States v. Fallbrook Public Utility District, D.C.Cal.1952, 108 F.Supp. 72, 79–82.

riparian agricultural use to which the lands can be put. The Government has put to beneficial use water to the extent of an average of 9934 acre-feet per year. The present needed average is 11,000 acre-feet per year. This use is reasonable and beneficial. Included in this amount is 4806 acre-feet used on irrigated lands outside the watershed which the Government has acquired the right to use by prescription, unaffected by any administrative action by the Department of Water Resources of the State of California.

10. A study of the water supply leads to the conclusion that not more than 12,-500 acre-feet annually, under the most favorable circumstances, are available as a water supply at Camp Pendleton.

11. If the correlative rights of the two chief riparian owners are considered, there was not at the time of the filing of the appropriation notices by Santa Margarita in 1946 and in 1947, any surplus water supply to appropriate.

12. There is no surplus water supply at the present time subject to appropriation.

13. As Santa Margarita has not made any diversion and no permits for diversion or for construction of a dam have been issued by the State of California, injunction against further prosecution of the applications is not necessary. A declaration of rights will suffice. The Court is certain that, in acting on any application, the State authorities will take into consideration the terms of this decision.

14. Findings and Judgments to be prepared by counsel for the Government declaring the rights and quieting title.

15. The adjudication here made and the Findings and Judgment shall be considered a partial adjudication of the claim herein under Rule 54(b) of Federal Rules of Civil Procedure, 28 U.S.C.A., be subject to revision, and not become final until the claims of Santa Margarita and Fallbrook are finally determined. See, Reeves v. Beardall, 1942, 316 U.S. 283, 62 S.Ct. 1085, 86 L.Ed. 1478.

## APPENDIX A

### Order on Pre-Trial Hearing

Separate trials in the above-entitled action having been ordered March 31, 1952 by this Court as between the United States of America and Fallbrook Public Utility District, Defendant; Santa Margarita Mutual Water Company, Defendant and the State of California, Defendant in Intervention, having been made a party to the separate trials on July 11, 1952; a pre-trial conference having been duly held by this Court July 8, 1952 through July 11, 1952, the parties being represented by their respective counsel, who after extended conferences have approved as among themselves in regard to this cause the agreed facts and having severally set out certain contentions of the parties and disputed facts; all as evidenced by the attached document designated "Pre-Trial Order" signed by the respective counsel and which is incorporated herein; questions of law for determination in advance of trial having been separately tendered by the respective parties; this Court finds that it has jurisdiction of the proceedings and that there is in existence an actual controversy between the parties.

The Court finds that it is for the best interest of the parties hereto and for the public interest that all rights to the use of water in the Santa Margarita River system of all parties to this action be determined as against the others and the filing of cross-pleadings is dispensed with as unnecessary and inconvenient. Provided that the Order setting this cause for separate trials is not affected hereby.

The issues in this cause are hereby defined and limited in conformity with the statements contained in the Stipulation between the State of California and the United States of America, dated November 29, 1951, a copy of which is embraced in Paragraph H 1 of the attached Pre-Trial Order.

It Is Therefore Ordered that the attached Pre-Trial Order is adopted by this Court; that the Court reserves the right to amend it by consent of the parties or in the furtherance of justice; that upon trial of this

cause no proof shall be required as to matters of fact specifically agreed upon in the Pre-Trial Order.

## Pre-Trial Order

A pre-trial conference having been held commencing on July 8, 1952, at San Diego, California, Honorable Chief Judge LEON R. YANKWICH presiding, the United States of America, Plaintiff, appearing by its counsel Willam H. Veeder, Esquire, Special Assistant to the Attorney General, Department of Justice, and David W. Agnew, Esquire, Attorney, Department of the Navy; Fallbrook Public Utility District, Defendant, appearing by its counsel Phil D. Swing, Esquire; Santa Margarita Mutual Water Company, Defendant, appearing by its counsel W. B. Dennis, Esquire; the State of California, Defendant in Intervention, appearing by its counsel Arvin B. Shaw, Jr., Esquire, Assistant Attorney General of California:

The Court Makes the Following Order on Pre-Trial:

*Jurisdiction:* .

▮ This Court has jurisdiction of the above-entitled action by reason of the express declaration by Congress that the United States District Court " * * * shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, * * *." [1]

*Existence of Controversy:*

This Court finds that an actual controversy exists over the respective claims of rights to the use of water of the Santa Margarita River System among the United States of America, Plaintiff; Fallbrook Public Utility District, Defendant; Santa Margarita Mutual Water Company, Defendant; and the State of California, Defendant in Intervention and other defendants.[2]

*Request for Action:*

At the request of the Department of the Navy this action was instituted by the Attorney General of the United States of America.[3]

*Separate Trials:*

This Court on March 31, 1952, entered an order * granting separate trials against the named defendants. That order is as follows:

"The plaintiff having moved the Court for an order directing a separate trial of the issues herein as to each of the defendants Santa Margarita Mutual Water Company and Fallbrook Public Utility District, and

"It appearing that because of the large number of defendants involved in this action it will not be practicable to try the issues as to all of the defendants in one trial, and

"It further appearing that each of the defendants above named claims an appropriative right to divert large quantities of water from the watershed of the Santa Margarita River, and that the plaintiff contends that proof of its rights and those of defendants Mary Vail Wilkinson, Mahlon Vail, Edward N. Vail, Margaret Vail Wise and Nita M. Vail, trustees, will show that no water of said river is surplus for appropriation by defendants Santa Margarita Mutual Water Company and Fallbrook Public Utility District, and

"It further appearing that the issues presented with reference to each of the defendants Santa Margarita Mutual Water Company and Fallbrook Public Utility District may be tried in separate trials without prejudice to the rights of such defendants and without prejudice to the rights of any other defendant, and

---

1. 28 U.S.C. § 1345.

2. Transcript of pre-trial proceedings, pages 38, 78, 81.

3. Plaintiff's Exhibit No. 1—Letter, dated November 14, 1950, from Dan A. Kimball, then Acting Secretary of the Navy, requesting the Attorney General to take action to protect the rights of the United States of America in the Santa Margarita River.

* This order was entered over the objections of the defendants here involved.

"It further appearing that a separate trial as to each of said last named defendants will facilitate the disposition of the issues as to many of the other defendants, and good cause appearing therefor,

"It Is Ordered that a separate trial be had as to the issues with reference to the defendant Santa Margarita Mutual Water Company and that a separate trial be had as to the issues with reference to the defendant Fallbrook Public Utility District."

On July 11, 1952, the scope of the separate trials was broadened to include the State of California, Defendant in Intervention.[4]

### Agreed Facts [5]

A. Description of the Santa Margarita River System and Its Drainage Area

1. The Santa Margarita River is a nonnavigable intermittent stream having a drainage area of 740 square miles, 192 square miles of which are situated in San Diego County, California, and 548 square miles in Riverside County, California.[6] The Santa Margarita River watershed is semi-arid.[7]

2. Temecula Creek and Murrieta Creek have their junction at the head of Temecula Gorge and there form the Santa Margarita River.[8]

3. Rising on the eastern slope of the Coastal Range in San Diego County, near the present site of the Palomar Observatory, Temecula Creek proceeds in a northerly and westerly direction a distance of approximately fourteen miles where it enters the Pauba Grant of the Vail Estate.[9] After entering the Pauba Grant it flows northwesterly through a portion of the grant known as Nigger Valley, for a distance of a little more than three miles. It then enters a narrow canyon on the Pauba Grant known as Nigger Canyon. In a state of nature Temecula Creek flowed through Nigger Canyon for a distance of approximately two miles. Situated across the channel of Temecula Creek at the upper end of Nigger Canyon on the Pauba Grant, in the Northwest Quarter of the Northwest Quarter, Section 10, Township 8 South, Range 1 West, is the Vail Dam, creating a reservoir with a capacity of approximately 50,000 acre-feet.[10]

4. Below the Vail Dam, Temecula Creek traverses Pauba Grant for a distance of approximately eleven miles.

5. Leaving the Pauba Grant of the Vail

---

4. Transcript of pre-trial proceedings, page 305, lines 4–16.

5. Relief map from the office of Major General Oliver P. Smith will be used throughout for location and general reference. This map is entitled "Photo Surfaced Terrain Model 16 P3, U. S. Marine Corps Reservation, Camp Joseph H. Pendleton, Oceanside, Calif." and was prepared January 1951 by U. S. Navy Special Devices Center, Port Washington, L. I., N. Y.

6. Plaintiff's Exhibit No. 2—Map of the drainage area of the Santa Margarita River, disclosing the Santa Margarita River, Murrieta Creek, Temecula Creek and other affluents of the stream; the location of the military establishments involved in the litigation and the location of the Vail properties. Defendants are not to be bound by any data or information superimposed on the map other than that information which delineates the watershed; the extent of the Vail holdings and the location of Camp Pendleton, Naval Ammunition Depot and the United States Naval Hospital and the location of the Santa Margarita River, Temecula River and their tributaries.

7. Plaintiff's Exhibit No. 3—Climatological Data, California Section, U. S. Department of Commerce, Weather Bureau.

8. Plaintiff's Exhibit No. 2

9. Plaintiff's Exhibit No. 2

10. Plaintiff's Exhibit No. 2; Plaintiff's Exhibit No. 4—Application of the Vail Company to appropriate waters of Temecula Creek, Application No. 11518 and the permit granted, and Permit No. 7032 granting the application for the construction of the dam for the Vail Reservoir; Plaintiff's Exhibit No. 5—Capacity and area curve for Nigger Canyon (Vail) Reservoir; Plaintiff's Exhibit No. 6—Vail Dam and Reservoir data; elevation, capacity and related information; Plaintiff's Exhibit No. 7—Tabulation respecting the acre feet in Vail Lake from December 1948 to and including April, 1952.

Estate, Temecula Creek continues its westerly course across the Little Temecula Grant of the Vail Estate for a distance of approximately one and a half miles. That stream then enters the Temecula Grant of the Vail Estate, flowing a distance of approximately two miles.[11]

6. Immediately before leaving the Temecula Grant of the Vail Estate, Temecula Creek has its confluence with Murrieta Creek and below that point is known as the Santa Margarita River.

7. The Santa Margarita River then enters Temecula Gorge, a narrow canyon through which it flows southerly and westerly for a distance of approximately nine miles. Though Temecula Creek, prior to its junction with Murrieta Creek, flows alternately as a surface and subsurface stream, the Santa Margarita River throughout Temecula Gorge in the state of nature is a surface stream.[12]

8. Shortly after leaving Temecula Gorge, the Santa Margarita River enters Camp Joseph H. Pendleton, the Marine Corps Training Base. It then flows in a generally southwesterly direction through Camp Pendleton—Naval Ammunition Depot—United States Naval Hospital lands for a distance of about twenty-one miles to the Pacific Ocean. For the full twenty-one miles the course of the river lies entirely within the property of the United States of America.[13] *

9. The Santa Margarita River within the boundaries of the above-mentioned military establishments is an intermittent stream.

B. Tributaries of the Santa Margarita River

There are several tributaries of the Santa Margarita River from tidewater to its head waters:

1. DeLuz Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a westerly and southerly direction to its confluence with the Santa Margarita River several miles within the boundary lines of Camp Pendleton.[14]

2. Fallbrook Creek, an intermittent stream, rises east and south of the Santa Margarita River. Most of its length is within the boundaries of Camp Pendleton and the United States Naval Ammunition Depot and it has its present terminus in Lake O'Neill, an artificial reservoir which lies within the Camp Pendleton area.[15] In the state of nature, Fallbrook Creek flowed into the Santa Margarita River.

3. Sandia Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a southerly direction to its confluence with the Santa Margarita River at a point a short distance above the easterly boundary of Camp Pendleton.[16]

4. Rainbow Creek is an intermittent stream which rises east and south of the main channel of the Santa Margarita River and proceeds in a northerly and westerly direction to its confluence with that river a short distance above Sandia Creek.[17]

5. Murrieta Creek, an intermittent stream, has its source north of the Temecula Grant of the Vail Estate and traverses the lands of that grant before it joins Temecula Creek to form the Santa Margarita River. Junction of the streams takes place at a point about a half mile east of the westerly boundary of Temecula Grant of the Vail Estate and a short distance east of Temecula Gorge. It has several tributaries, most important of which is Cottonwood Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate. Santa Gertrudis Creek, a tributary

---

11. Plaintiff's Exhibit No. 2—Map of drainage area of Santa Margarita River.

12. Plaintiff's Exhibit No. 2

13. Plaintiff's Exhibit No. 2

* Except for such properties and lands as the Atchison, Topeka and Santa Fe Railroad Company may own.

14. Plaintiff's Exhibit No. 2

15. Plaintiff's Exhibit No. 2—Map of drainage area of Santa Margarita River.

16. Plaintiff's Exhibit No. 2.

17. Plaintiff's Exhibit No. 2.

of Murrieta Creek, is an intermittent stream rising on the Pauba Grant of the Vail Estate, traversing lands in other ownership before crossing a portion of the Temecula Grant prior to its confluence with Murrieta Creek. Warm Springs Creek, an intermittent stream, rises east of Murrieta Creek and flows into that stream just below the town of Murrieta.[18]

6. Penjango Creek, an intermittent stream, is tributary to Temecula Creek, rising south of that stream and joining it a short distance upstream from the junction of the stream last mentioned with Murrieta Creek. From its source to confluence Penjango Creek traverses a portion of the Little Temecula Grant, and then flows across the Temecula Grant of the Vail Estate, the property upon which its junction with Temecula Creek takes place.[19]

Other affluents of Temecula Creek are Lancaster Creek and Arroyo Seco, both of which are intermittent in character, flowing only during periods of high precipitation and entering Temecula Creek above Nigger Canyon.[20]

C. Subterranean Basins Underlying Santa Margarita River

From its head waters to the Pacific Ocean, the watershed of the Santa Margarita River System is underlaid with numerous subterranean basins. They differ greatly in size and capacity.[21]

Underlying the military establishments in question within the Santa Margarita River watershed are one or more underground basins or segments of basins, commonly known as:

1. Upper or O'Neill Basin or Segment,

2. Chappo or Home Ranch Basin or Segment,

3. Ysidora Basin or Segment.

Agreement in regard to the alluvial basins will not preclude defendants from contending that the named segments or basins are independent basins. Neither will it preclude the United States from contending that those segments or basins are geologically and hydrologically connected and constitute one basin.

The United States does not assert that there are any other basins within the watershed of the Santa Margarita River underlying Camp Joseph H. Pendleton, including the United States Naval Ammunition Depot, than those to which reference has been made.

Throughout the ground-water basin or basins within the watershed of the Santa Margarita River underlying Camp Pendleton are numerous wells of varying depths in the alluvium. The surface and subsurface area and the character and type of the deposits penetrated by the wells, so far as the same are known to the United States of America, had been analyzed.[22]

Defendants reserve the right to question the accuracy of these analyses and present contradictory evidence. This does not entail a questioning of the identification of the exhibits to which reference is made.

D. United States Geological Survey Records

The United States Geological Survey has

18. Plaintiff's Exhibit No. 2.

19. Plaintiff's Exhibit No. 2—Map of drainage area of Santa Margarita River.

20. Plaintiff's Exhibit No. 2

21. Plaintiff's Exhibit No. 8—Map disclosing the geology of the Santa Margarita Temecula River watershed, dated January 1952, Office of Ground Water Resources, Camp Pendleton, California; Plaintiff's Exhibit No. 9—Profile of the Santa Margarita River, disclosing elevation and location of principal basins beneath Temecula Creek and Santa Margarita River, entitled "Geologic Cross Section A–A' along the Santa Margarita

Temecula River," dated 10 July 1952, Office of Ground Water Resources, Camp Pendleton, California.

22. Plaintiff's Exhibit No. 12—Isopach map of alluvial deposits of a portion of the Santa Margarita River within Camp Joseph H. Pendleton, San Diego County, California, Office of Ground Water Resources, Camp Pendleton, dated March 20, 1952. Plaintiff's Exhibit No. 13—Bar graph disclosing specific yield of materials of wells within the basin underlying Camp Joseph H. Pendleton by Office of Ground Water Resources, Camp Pendleton, dated March 1952.

maintained and published records of the following principal gauging stations within the watershed of the Santa Margarita River;

| Stream | Station | Period of record |
|---|---|---|
| Santa Margarita River | Ysidora | From February 19, 1923, to date |
| Santa Margarita River | Fallbrook | " November 25, 1924, to date |
| Temecula Creek | Temecula (Railroad) Canyon | " January 30, 1923, to date |
| Temecula Creek | Nigger Canyon | " January 30, 1923, to date |
| Murrieta Creek | Temecula | " October 1, 1930, to date |

In addition measurements have been taken for diversions at O'Neill Ditch and at other places on the Santa Margarita River System.[23]

E. Acquisition by the United States of America of Sites for Camp Joseph H. Pendleton, the United States Naval Hospital, and the United States Naval Ammunition Depot—General Statement

1. The United States of America acquired fee simple title to 9,147.55 acres (the present United States Naval Ammunition Depot) of land, more or less, in San Diego County, State of California, by a declaration of taking filed January 21, 1942, in the United States District Court for the Southern District of California.[24] It likewise acquired fee simple title to 123,620 acres of land, more or less, in San Diego County, California, by a declaration of taking filed December 31, 1942, in the United States District Court for the Southern District of California. Those two tracts of land thus acquired by the United States of America had historically comprised part of the Rancho Santa Margarita.[25] Fee simple title was likewise acquired by the United States of America to 1,676.58 acres of land, more or less, in the County of San Diego, State of California, by a declaration of taking filed December 22, 1943, in the United States District Court for the Southern District of California. By deed dated February 8, 1949, approximately 112.11 acres of land situated in Orange County, California, were conveyed to the United States of America. In addition to the above parcels of land, approximately 1574.61 acres of the Public Domain Lands situated in San Diego County, California, were transferred to Camp Pendleton by Public Land Order #293, dated August 8, 1945.[26]

2. Notices of acceptance by the United States of America of the cession of exclusive jurisdiction over each of the parcels of land referred to above, except the lands in Orange County and the lands described in Public Land Order No. 293, were forwarded to the Honorable Earl Warren, Governor of the State of California.[27] The

23. Plaintiff's Exhibit No. 14—U. S. G. S. records, Water Supply Papers for the Santa Margarita River System.

24. Plaintiff's Exhibit No. 15—Certified copies of certain documents involved in the acquisition of the 9,147.55 acres of land more or less comprising the United States Naval Ammunition Depot.

25. Plaintiff's Exhibit No. 16—Certified copies of certain documents involved in the acquisition of the 123,620 acres of land more or less comprising Camp Joseph H. Pendleton Marine Corps Training Base and United States Naval Hospital.

26. Plaintiff's Exhibit No. 17—Certified copies of certain documents involved in the acquisition of the 1,676.58 acres of land more or less; 112.11 acres of land and 1574.61 acres of the public domain lands comprising part of Camp Joseph H. Pendleton.

27. Plaintiff's Exhibit No. 18—Letter of January 12, 1943 from James Forrestal, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over the United States Naval Ammunition Depot; Plaintiff's Exhibit No. 19—Letter of September 8, 1943 from James Forrestal, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over Camp Joseph H. Pendleton and the United States Naval

legal effect of the notices given by the representative of the United States of America is a question to be resolved by the Court in this proceeding.

3. The approximately 135,000 acres of land are presently utilized for the following purposes; among others:

*Camp Joseph H. Pendleton*:

It is the function of Camp Joseph H. Pendleton to provide housing and training facilities for units of the Armed Forces, to conduct training of units of the Armed Forces in amphibious warfare and experimental work with landing craft, landing vehicles, tracked and affiliated equipment and the development thereof; to conduct combat training of the various units of the United States Marine Corps, including air-ground support coordination, and use of artillery, tanks and other equipment used in the conduct of modern amphibious and land warfare. In addition to the aforementioned activities, it is the function of Camp Pendleton to provide logistic support for units of the United States Marine Corps together with material maintenance and storage facilities, for supplies and equipment and to house and train replacements for subsequent assignment to various operating units of the United States Marine Corps.

*United States Naval Hospital*:

The United States Naval Hospital, with a capacity of approximately 1,550 beds, established at Camp Joseph H. Pendleton, provides medical and hospital services to personnel of the Armed Forces, their dependents and other authorized personnel at 83 Naval shore activities located in the Southern California area and provides medical and hospital care to personnel of units of the United States Fleet.

*United States Naval Ammunition Depot*:

The United States Naval Ammunition Depot, Fallbrook, California, provides facilities for the storage, segregation, reconditioning and issuing of ammunition for operating units of the United States Fleet and the United States Marine Corps and maintains ammunition stocks for shore establishments of the United States Navy located in the Southern California area. In addition, this Naval Ammunition Depot stores and ships ammunition for use by combat elements of the United States Navy and United States Marine Corps.

Agreement as to the use of the properties above mentioned neither constitutes an admission respecting the utilization of the entire area for military purposes nor does it constitute an admission respecting the extent or effect of the exclusive jurisdiction of the United States of America over the property in question.

4. The installations referred to in the preceding paragraphs are disclosed on the accompanying map.[28]

5. The Santa Margarita River in its course traverses virtually the length of Camp Pendleton—Naval Ammunition Depot—United States Naval Hospital lands from east to west for a distance of approximately 21 miles. There are no users below Camp Pendleton on the Santa Margarita River for the United States of America owns the lands on both banks of that stream from the point where the Santa Margarita River enters upon the military establishments above mentioned to the point of confluence of the river with the Pacific Ocean,[29] except for such properties and lands as the Atchison, Topeka and Santa Fe Railroad Company may own.

6. A portion of the approximately 135,000 acres of lands owned by the United

Hospital; Plaintiff's Exhibit No. 20—Letter of February 18, 1944 from A. L. Gates, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over 1676.58 acres of land in connection with Camp Joseph H. Pendleton.

28. Plaintiff's Exhibit No. 21—Uncontrolled Mosaic, Camp Pendleton, Calif. Photographed by Patrol Squadron 61, 1951. Plaintiff's Exhibit No. 22—Map disclosing location of all structures—United States Navy Hydrographic Office, map of Camp Joseph H. Pendleton, 1st Edition, March 1952.

29. Plaintiff's Exhibit No. 21—Uncontrolled Mosaic, Camp Pendleton, Calif.

States of America comprising the military establishments in question is riparian to the Santa Margarita River.[30]

7. By a stipulated judgment, Exhibit A of the complaint in this case, a defendant in this action, the Vail Estate, and the Rancho Santa Margarita, a corporation, predecessor in interest of the United States of America, concluded protracted litigation between themselves over their respective rights in the Santa Margarita River. By an order of this Court there was filed July 8, 1952 the following stipulation between the United States of America and the Vail Estate:

"Whereas, on December 27, 1940, a judgment was entered in that action entitled Rancho Santa Margarita, a corporation, Plaintiff, v. N. R. Vail, et al., Defendants, in the Superior Court of the State of California in and for the County of San Diego, case No. 42850; and

"Whereas, the United States of America, during the years 1941–1943 acquired all the lands and rights to the use of water in the Temecula-Santa Margarita River which had been owned by the Rancho Santa Margarita, Plaintiff in the action referred to in the preceding paragraph. By that acquisition the United States of America succeeded to all the rights, title, and interest of the Rancho Santa Margarita in the Temecula-Santa Margarita River; and

"Whereas, on January 25, 1951, the United States of America instituted the above-entitled action, incorporating in the complaint filed therein, a copy of said judgment of December 27, 1940, as Exhibit A to its complaint. To the end that a full declaration of Plaintiff's rights in and to the waters of said River as against all other users thereof and claimants thereto might be obtained in this action, Plaintiff named among many other Defendants, Mary

Vail Wilkinson, Mahlon Vail, Edward N. Vail, Margaret Vail Wise, and Nita M. Vail, Trustees herein collectively referred to as the Vails. Notwithstanding the naming of the Vails as parties defendant in the present action the United States of America and the Vails are mutually in agreement that as between themselves the said judgment of December 27, 1940, is and shall continue to be binding upon them and each of them.

"Accordingly, it is hereby stipulated and agreed by and between the United States of America, Plaintiff herein, and the Vails, Defendants herein, through their respective counsel, as follows:

"1. That the rights and duties of Plaintiff, United States of America, and the Vails, in and to the waters of the Temecula-Santa Margarita River as between Plaintiff and said Vails, are those fixed, determined, and declared in that certain judgment entered on December 27, 1940, in the case of Rancho Santa Margarita, a corporation, Plaintiff, v. N. R. Vail, et al., Defendants, in the Superior Court of the State of California in and for the County of San Diego, case No. 42850.

"2. That neither Plaintiff herein nor said Vails claim or will claim, in the within action, any rights or duties as against the other, other than or different from, those fixed, determined and declared in said judgment of December 27, 1940.

"3. That no issue is or will be raised in this litigation as to the operations of the parties under said judgment, it being understood that neither party will claim in this litigation that the other has failed in any way to comply with said judgment of December 27, 1940.

"4. The introduction of a properly certified copy of the said judgment of December 27, 1940 in the record in

30. Plaintiff's Exhibit No. 23—Land classification map of the Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton; Plaintiff's Exhibit No. 24—Land utilization map of Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton.

this case will constitute proof of the rights and duties of the respective parties hereto as against each other as specified in said judgment.

"Signed this 23rd day of Oct. 1951."

By agreeing to the facts set forth in Paragraph 7, the defendants do not admit the admissibility of the judgment or stipulation in this action which has arisen between the United States of America and the defendants named herein or waive any rights to have said stipulated judgment or stipulation deleted from the records in the proceeding.

8. That the predecessors in interest of the United States in ownership of Camp Pendleton and the Naval Ammunition Depot did not prior to the effective date of the State Water Commission Act of 1913 post, file or record any notices of appropriation of the waters of the Santa Margarita River system.

9. That Plaintiff owns approximately 6,869.6 acres of land which lie within the watershed of DeLuz Creek and is the owner in fee of approximately 3,798.9 acres of land lying within the watershed of Fallbrook Creek.

10. The Plaintiff is the owner in fee of approximately 7,258.9 acres of land lying within the watershed of Pilgrim Creek and the owner in fee of approximately 1942.1 acres of land lying within the watershed of Windmill Creek. That said Windmill Creek and said Pilgrim Creek drain into and are part of the watershed of the San Luis Rey River.

F. Santa Margarita Mutual Water Company

1. The Santa Margarita Mutual Water Company is a mutual water company organized and existing under and pursuant to the laws of the State of California and is currently in good standing.[31]

2. Application No. 11578 * to appropriate water was filed October 4, 1946, by the Santa Margarita Mutual Water Company with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application was for sixty (60) cubic feet of water per second from the Santa Margarita River.

In addition to the direct flow right above mentioned, the application in question is for a storage right of 5,000 acre-feet of water from Temecula Creek at the approximate site of the Vail Dam and Reservoir.[32]

3. Application No. 12152 * to appropriate water was filed November 12, 1947, by the Santa Margarita Mutual Water Company with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application was for 60,000 acre-feet of water from the Santa Margarita River for storage.[33]

G. Fallbrook Public Utility District

1. The Fallbrook Public Utility District is a public agency of the State of California, organized and existing under and pursuant to the Public Utility District Act of the State of California, Gen.Laws, Act 6391, and is currently in good standing.[34]

2. Application No. 11586 * to appropriate water was filed October 11, 1946, by the Fallbrook Public Utility District with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application

31. Defendant Santa Margarita Mutual Water Company Exhibit No. A, organizational documents, including State of California certified statement as to Current standing.

* The period each year during which the applicant seeks to divert or impound the water described is contained in the accompanying application.

32. Defendant Santa Margarita Mutual Water Company Exhibit No. B, application No. 11578 to appropriate water.

33. Defendant Santa Margarita Mutual Water Company Exhibit No. C, application No. 12152 to appropriate water.

34. Defendant Fallbrook Public Utility District Exhibit No. A, organizational documents, including State of California certified statement as to current standing.

was for 2½ (two and one-half) cubic feet of water per second from the Santa Margarita River.[35]

3. Pursuant to said last-mentioned application, there was issued on February 18, 1948, to the Fallbrook Public Utility District permit No. 7033. That permit was approved subject to vested rights. The quantity of water to be diverted pursuant to it was not to exceed 2.5 cubic feet per second from April 1 to about November 1st of each year and throughout the remainder of the year as required for domestic and municipal uses.[36]

4. Application No. 11587 * to appropriate water was filed October 11, 1946, by the Fallbrook Public Utility District with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application was for 10,000 acre-feet of water for storage from the Santa Margarita River.[37]

5. Pursuant to said last-mentioned application, there was issued on April 23, 1951, to the Fallbrook Public Utility District permit No. 8511. That permit was approved subject to vested rights. The quantity of water to be impounded pursuant to it was not to exceed 10,000 acre-feet for storage to be collected from January 1 to December 31 of each year.[38]

6. Application No. 12178 * to appropriate water was filed November 28, 1947, by the Fallbrook Public Utility District with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application is for storage of 10,000 acre-feet of water per annum, 500 acre feet from Rainbow Creek and 9,500 acre feet from Santa Margarita River. Said application is now under consideration by the State of California, Department of Public Works, Division of Water Resources, State Engineer, and notice of the application is now being published.[39]

7. Application No. 12179 * to appropriate water was filed November 28, 1947, by the Fallbrook Public Utility District with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application is for storage of 10,000 acre-feet of water per annum, 1,500 acre feet from Sandia Creek and 8,500 acre feet from Santa Margarita River. Said application is now under consideration by the State of California, Department of Public Works, Division of Water Resources, State Engineer, and notice of the application is now being published.[40]

8. The legal title to whatever rights Fallbrook Public Utility District may have acquired or may hereafter acquire to the waters of the Santa Margarita River system by virtue of its said applications to and permits from the State of California or otherwise, are vested in the District in trust for the uses and purposes set forth in the Public Utility District Act of the State of California and the beneficiaries of the trust are the landowners and water users in the District.

H. State of California

1. The State of California, defendant in intervention, has entered into the following stipulation with the United States of America:

"On the 15th day of August, 1951,

---

35. Defendant Fallbrook Public Utility District Exhibit No. B, application No. 11586 to appropriate water.

36. Defendant Fallbrook Public Utility District Exhibit No. C, Permit No. 7033 signed by Edward Hyatt, State Engineer on February 18, 1948.

* The period each year during which the applicant seeks to divert or impound the water described is contained in the accompanying application.

37. Defendant Fallbrook Public Utility District Exhibit No. D, application No. 11587 to appropriate water.

38. Defendant Fallbrook Public Utility District Exhibit No. E, Permit No. 8511 signed by A. D. Edmonston, State Engineer on April 23, 1951.

39. Defendant Fallbrook Public Utility District Exhibit No. F, application No. 12178 to appropriate water.

40. Defendant Fallbrook Public Utility District Exhibit No. G, application No. 12179 to appropriate water.

the People of the State of California, in accordance with invitation of the United States of America, petitioned this Court to intervene in this litigation. On that date an Order was allowed and entered by this Court granting the Petition.

"For the clarification of the issues in this litigation, and for the benefit of all of the parties to this cause, it is hereby stipulated:

"I

"That in Paragraphs VIII and IX of plaintiff's Complaint herein, and in Paragraphs 2 and 3 of the Prayer of said Complaint, the word 'paramount' is used in the same sense in which that word is used in the second paragraph, on page 374 of the opinion of the Supreme Court of California in the case of Peabody v. [City of] Vallejo, 2 Cal. 2d 351 (fourth paragraph on page 494, 40 P.2d 486.)

"II

"That in this cause, the United States of America claims only such rights to the use of water as it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of water which it may have gained by prescription or use, or both, since its acquisition of the Rancho Santa Margarita.

"III

"That the United States of America claims by reason of its sovereign status no right to the use of a greater quantity of water than is stated in Paragraph II, hereof.

"IV

"That the rights of the United States of America to the use of water herein are to be measured in accordance with the laws of the State of California.

"V

"That the parties to this Stipulation will request the entry of a Pretrial Order by this Court defining the issues in this cause, in conformity with the statements contained in this Stipulation.

"VI

"That there will be a full, complete and mutual exchange of data and information as to the subject matter of this cause collected by the respective parties to this Stipulation, including data respecting the issuance of any permits or licenses issued by the State of California in connection with the rights to the use of water of the Santa Margarita River. Such exchange of information by the United States, will be subject to clearance by the Commanding Officer, Camp Joseph H. Pendleton, in respect to military security, as determined by said Officer.

"Dated: November 29, 1951."

2. That stipulation has been approved by the Court and ordered filed.

3. Counsel for the State of California are presently informed that the State of California owns no lands and has no liens on lands within the Santa Margarita River system watershed. They reserve the right, however, should further investigation disclose any such interest to amend their answer and prove such ownerships.

Contentions of the United States of America

1. In addition to the physical features of the Santa Margarita River system contained in the Agreed Facts, the United States contends that:

a. Below the Vail Dam, Temecula Creek traverses a highly porous area where that stream, except during periods of high runoff, disappears into the Temecula Basin. In a state of nature Temecula Creek customarily again becomes a surface stream at a distance of about three miles from the present site of the Vail Dam. Presently, however, due to the control of the stream arising from the mentioned dam and the draft upon Temecula Basin by the Vail Estate, Temecula Creek reappears as a surface stream at a greater distance from the mouth of Nigger Canyon dependent upon the draft and the period elapsing between releases from Vail Reservoir.

b. Within Camp Pendleton the Santa Margarita River does not flow as a continuous surface stream but during the dry season of the year the stream customarily and ordinarily sinks into the highly porous ground water basin underlying Camp Pendleton and the other military establishments. When that basin has been filled, the Santa Margarita River ordinarily comes to the surface some two or three miles from tidewater. In a state of nature it continues then to the Pacific Ocean as a stream of diminishing volume.

c. From its head waters to the Pacific Ocean the Santa Margarita River passes over and through numerous ground water basins. The water in those basins is contained by bedrock or other impervious material. The basins are filled with alluvial deposits of varying degrees of porosity. The basins differ greatly in size and in capacity. The waters of the Santa Margarita River in its course through the valley penetrate and fill the voids of the porous alluvium. When the water of the stream sinks to bedrock or the other impervious material comprising the beds of the basins, in which the detrital material lies, it spreads out laterally filling the basins. When completely charged, the waters of the basins support the surface stream and progress slowly downstream through the permeable material.

Ground water basins of the character described underlie Temecula Creek in portions of Oak Grove Valley; and Lancaster Creek in Lancaster Valley. Temecula Basin, one of the largest in the entire watershed of the Santa Margarita River, is located on the property of the Vail Estate. This large T-shaped alluvial deposit area has the stem of the T along the main channel of Temecula Creek for a distance of approximately eight miles, varying in width from two-thirds of a mile to a mile and a half.[1] That area of the Temecula Basin immediately below the present site of Vail Dam is comprised of coarse, highly porous material and is known as the "out wash." Into that "out wash" except in periods of extremely heavy precipitation, Temecula Creek sinks. About three miles below the "out wash" the Temecula Basin becomes an artesian area from which Temecula Creek again emerges as a surface stream.

The right arm of the T-shaped alluvial basin extends northward underlying Murrieta Creek for a short distance above that stream's confluence with Temecula Creek. The left arm of the T-shaped Temecula alluvial basin extends southward beneath Penjango Creek.[2]

Underlying Murrieta Creek and separated from the Temecula Basin is another large alluvial basin known as the Murrieta Basin. That is comprised of valley fill similar to that found in the other basins.

Due to the existence of granitic rock immediately underlying the stream from approximately the point of confluence of Temecula Creek with Murrieta Creek to the mouth of the Temecula Gorge, the Santa Margarita River in the state of nature is a surface stream. That granitic underlay of the stream continues from the point mentioned across the boundary of Camp Pendleton to a point approximately one and one-half miles below the confluence of DeLuz Creek with the Santa Margarita River. At that point the stream opens out into a rather broad alluvial flood plain. That alluvial area extends from the point last mentioned to tidewater, constituting a large ground-water basin. That ground-water basin is comprised of a relatively coarse and loose porous valley fill at the upstream end comparable to the "out wash"

1. Plaintiff's Exhibit No. 8—Map disclosing the geology of the Santa Margarita-Temecula River watershed, dated January 1952, Office of Ground Water Resources, Camp Pendleton, California; Plaintiff's Exhibit No. 9—Profile of the Santa Margarita River, disclosing elevation and location of principal basins beneath Temecula Creek and Santa Margarita River, entitled "Geologic Cross Section A–A' along the Santa Margarita-Temecula River," dated 10 July 1952, Office of Ground Water Resources, Camp Pendleton, California.

2. Plaintiff's Exhibit No. 8—Map disclosing the geology of the Santa Margarita-Temecula River Watershed.

area of the Temecula Basin above described.[3] Approaching the ocean the character of the alluvium becomes increasingly fine and tight.

The alluvial ground-water basin underlying the Santa Margarita River within Camp Pendleton and the other military establishments is geologically and hydrologically interconnected, comprised, however, of three separate segments which lend themselves readily to arbitrary subdivisions. They are

1. Upper or O'Neill Basin Component,

2. Chappo or Home Ranch Basin Component,

3. Ysidora Basin Component.

2. Exclusive jurisdiction over the approximately 135,000 acres of land constituting Camp Joseph H. Pendleton, United States Naval Hospital and the United States Naval Ammunition Depot resides in the United States of America. By reason of exclusive jurisdiction, with an exception having no bearing here, the police power of the State of California has no application and is without force and effect in regard to the lands, buildings, or any of the components constituting the installations or the rights to the use of water claimed by the United States of America.

3. Construction of the military installations in question commenced immediately upon the acquisition by the United States of America of the lands to which reference has been made. Those installations since that date and all of the approximately 135,000 acres of land have been continuously utilized for military purposes.

4. A water system was constructed and is now operated to serve the military installations.[4]

5. Water has been delivered through the distribution system to the military installations since the properties were acquired by the United States of America.[5] Since that date water has likewise been delivered to agricultural lands when the lands and water were not required for military purposes.

6. All of the land and rights to the use of water acquired from the Rancho Santa Margarita and all of the water acquired through prescription or use or both, are primarily for military purposes. To avoid possible waste of water entails the utilization of it for agricultural purposes when the water is not immediately needed for military purposes.

7. Water has been continuously diverted from the Santa Margarita River and from the ground-water basin underlying the military establishments in question by the United States of America for military purposes [6] and agricultural purposes [7] since the acquisition of the lands in question. The surface stream and the ground-water basin underlying those military establishments constitute a single source of supply.

8. For both military and agricultural purposes the United States of America has historically utilized its rights to the use of water both within and outside of the watershed of the Santa Margarita River. Thirty days prior to trial there will be delivered to the defendants named in this separate trial the quantities of water from the Santa

3. Plaintiff's Exhibit No. 10—Map of lower Santa Margarita River Valley, Camp Joseph H. Pendleton, California, showing ground-water storage units, general geology, and location of wells and stream-gaging stations, compiled November 1951 by U. S. G. S.; Plaintiff's Exhibit No. 11—Geologic Section A–A' through the lower Santa Margarita River Valley, showing unconsolidated deposits and water-level profiles, United States Geological Survey.

4. Plaintiff's Exhibit No. 22—Map disclosing location of all structures—United States Navy Hydrographic Office, map

of Camp Joseph H. Pendleton, 1st Edition, March 1952.

5. Plaintiff's Exhibit No. 22—Map disclosing location of all structures.

6. Plaintiff's Exhibit No. 26—Tabulation in acre feet of water pumped at Camp Pendleton, entitled "Camp Pendleton Total Pumps, Camp Pendleton Records Diversions."

7. Plaintiff's Exhibit No. 27—Tabulation in acre feet of water pumped from Ysidora area for agricultural purposes, entitled "Ysidora Mesa Pumps, Camp Pendleton Records Diversions."

Margarita River historically utilized both within and without the watershed.

9. Based on the troop load which will be attained by the end of Fiscal Year 1954, the annual demand for water from the Santa Margarita River for use by the United States of America at Camp Pendleton and the other military establishments will increase to approximately 23,000 acrefeet. Full mobilization of the Nation for war would increase the demand to the full extent of the relief prayed in the complaint in this case, 35,000 acre feet of water annually.

10. Long prior to the acquisition by the United States in the year 1884, its predecessors in interest had diverted for agricultural purposes and had impounded large quantities of water from the Santa Margarita River in Lake O'Neill.[8] For a similar period the predecessors in interest of the United States had diverted from the surface flow or pumped from the underground basin underlying the river, large quantities of water of the Santa Margarita River out of the watershed of that stream for agricultural uses. Thirty days prior to trial, the Plaintiff will furnish Defendants a statement of the quantities of water used by the United States and its predecessors in interest outside the watershed of the Santa Margarita River; the several places of use; periods of time used and purposes of use, so far as that information is available. Moreover, the supply available from the Santa Margarita River system has been historically insufficient to meet the demands of the predecessors in interest of the United States of America and of the United States.

11. Historically the waters from the Santa Margarita River were diverted from the stream by the predecessors in interest of the United States of America and utilized upon the riparian lands for agricultural purposes. Large quantities of the water were likewise pumped from the ground-water basin underlying those riparian lands and were likewise used for agricultural purposes.

12. Large quantities of both the surface stream of the Santa Margarita River and of the ground-water basin underlying that stream were historically used by the predecessors in interest of the United States of America for stock watering and domestic purposes.

13. The high water table of the groundwater basin above described subirrigated the entire surface area of the basin, greatly enhancing the production of natural forage, thus increasing the carrying capacity for livestock of the lands with the attendant increment in the value of the lands. That natural subirrigation from the groundwater basin above described since the acquisition of the lands in question by the United States of America has continued to subirrigate the natural forage, providing feed for livestock and maintaining a coverage of the surface area necessary for the present military use.

14. Though the Santa Margarita River is an intermittent stream, it has historically for brief periods raised to higher levels within the natural high water channel of the stream, overflowing lands which during the long dry periods receive only subirrigation from the ground-water basin underlying the area. That overflow watered, enriched, and fertilized the lands resulting in increased productivity of the land and enhancement of its value.

15. The United States of America as owner of the lands is invested with title to rights to the use of water in the Santa Margarita River for the subirrigation and the overflow above mentioned in addition to the other rights to the use of water above described and subsequently to be described. Obstruction or diversion of the natural flow of the Santa Margarita River upstream from properties owned by the United States of America constitutes an invasion of any and all of the rights of the United States of America to the use of water to the irreparable damage of the United States of America.

8. Plaintiff's Exhibit No. 29—Tabulation Lake O'Neill Reservoir storage records. Plaintiff's Exhibit No. 30—Area and capacity curve of Lake O'Neill, Camp Joseph H. Pendleton, Public Works Office, PW drawing #1167CP.

16. There are 37,944 * acres of land riparian to the Santa Margarita River within the boundaries of Camp Joseph H. Pendleton, the United States Naval Ammunition Depot and the United States Naval Hospital.[9]

17. Of those 37,944 acres of land riparian to the Santa Margarita River 18,701.1 * acres are irrigable and are susceptible of practicable and profitable irrigation,[10] of which 4,601.9 irrigable acres are within the United States Naval Ammunition Depot.

18. The irrigation requirements for practicable and profitable irrigation for those lands is 69,237.1 * acre feet a year.[11]

19. In addition to the riparian and irrigable lands within the watershed as above described, there are lands lying outside of the watershed which have historically been irrigated from the ground-water basin underlying the military establishments in question. Those lands are situated within the area known as the Stuart Mesa, lying north of the Santa Margarita River, and South Coast Mesa, lying south of the stream. Thirty days prior to trial there will be delivered to the defendants the exact acreage as determined by the United States lying outside of the watershed in regard to the land in question; the duty of water and the maximum demand upon the Santa Margarita River which the United States is asserting in connection with those properties.

20. The principal source of water from the Santa Margarita River for use on the lands now comprising the military establish-

ments in question is the ground-water basin which has been described. Future demands will be principally met by pumping from the basin. The ground-water storage capacity of the three components of the subterranean basin underlying the Santa Margarita River within Camp Joseph H. Pendleton, the United States Naval Hospital and the United States Naval Ammunition Depot are as follows:

| | | |
|---|---|---|
| Upper Basin (O'Neill) Component | 12,500 acre feet | |
| Chappo Basin (Home Ranch) Component | 27,500 " " | |
| Ysidora Basin Component | 8,600 " " | |
| | 18,100 acre feet | |

21. To provide a fresh water barrier for the prevention of salt water intrusion, which has presently destroyed two wells, it is requisite that there be maintained a fresh water barrier in the Ysidora Basin Component. Thus the maximum usable capacity of the ground-water basin is 40,000 acre feet. To accomplish the maximum utilization of the storage capacity of the ground-water basin and the rights to the use of water, the United States will pump largely from the Upper and Chappo Basins-Components, thus permitting the water in the Ysidora Basin-Component to remain at a level which will effectively prevent the intrusion of salt water into the basin.

22. In a state of nature, the process of recharging the under-ground basin resulted in Santa Margarita River water occasionally reaching tidewater. Plans now being effected, however, in regard to the pumping from the ground-water basin underlying

* This figure is subject to slight modification dependent upon the ultimate determination of the crest of the watershed in certain disputed areas.

9. Plaintiff's Exhibit No. 24—Land Utilization map of Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton.

10. Plaintiff's Exhibit No. 23—Land classification map of the Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton; Plaintiff's Exhibit No. 24—Land Utilization map of Santa Mar-

garita watershed; Plaintiff's Exhibit No. 25—Soil survey field sheets, soil survey legend, of Camp Joseph H. Pendleton, dated June 1952.

11. Plaintiff's Exhibit No. 23—Land classification map of the Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton; Plaintiff's Exhibit No. 24—Land Utilization map of Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton; Plaintiff's Exhibit No. 25—Soil survey field sheets, soil survey legend, of Camp Joseph H. Pendleton, dated June 1952.

Camp Pendleton and the other military establishments, together with the regulation of surface stream flow, will eliminate or greatly reduce the amount of Santa Margarita River water from reaching tidewater.

23. It is estimated, premised upon the available data respecting the annual runoff of the Santa Margarita River system and upon known demands for water from that stream system within its watershed, that the maximum quantity of water which would be available to Camp Pendleton and the other military establishments is 12,500 acre feet per annum.[12] Only by adherence to the strictest conservation practices and the use and re-use of water will it be possible to meet the demands for water of Camp Pendleton and the other military establishments.

24. The Vail Estate has title to 29,000 acres of riparian land which is susceptible of practicable and profitable irrigation from the Santa Margarita River * and its tributaries. Of that acreage, due to the insufficient supply of water in the river and its tributaries, the Vail Estate presently irrigates only 4,200 acres of land. The annual water duty for those lands is presently three acre feet per acre. The other riparian lands susceptible of irrigation, if the water was available for them, would likewise utilize three acre feet per acre per year.[13]

25. The Vail Estate is presently expanding its operation upon its riparian land and has adopted a program better to use the available supply of water through the construction of small impounding reservoirs and water spreading devices.

26. The Vail Estate, in addition to its riparian rights in the stream in question which are above described, is the owner of an appropriative right to impound in Nigger Canyon Reservoir and utilize for purposes of irrigation 50,000 acre feet of water All of the water yielded by the riparian rights and the appropriative rights of the Vail Estate are beneficially applied to practicable and profitable irrigation of crops commonly grown in the area in which the property is located.

27. Pursuant to the Stipulated Judgment, Exhibit A of the Complaint in this case, the Vail Estate during the irrigation season of each year is required to maintain a constant flow of water of not less than three cubic feet per second at the Temecula gauging station at the head of Temecula Gorge. That water is delivered to the United States of America in accordance with the provisions of the Stipulated Judgment and is not open to appropriation under the laws of the State of California. Moreover, that three second feet of water which would not be in the stream were it not for the Stipulated Judgment is not available for use and diversion by the defendants, Fallbrook Public Utility District and Santa Margarita Mutual Water Company, or the State of California.

28. All of the water to which the United States is entitled by reason of the rights to the use of water under the Stipulated Judgment and as against the defendants in this litigation may be used outside of the watershed of the Santa Margarita River or may be impounded in the discretion of the United States by reason of the express provisions of the Stipulated Judgment.

29. The United States of America declares that Permit No. 7033 and Permit No. 8511, issued by the Department of Public Works, Division of Water Resources, State Engineer, State of California, to the Fallbrook Public Utility District are null and void and of no force and effect. It likewise denies that the Fallbrook Public Utility

12. Plaintiff's Exhibit No. 14—U. S. G. S. records, Water Supply Papers for the Santa Margarita River System.

(* Temecula Creek)

13. Plaintiff's Exhibit No. 31—Map of Pauba Ranch and vicinity, Riverside County, California; Plaintiff's Exhibit No. 32—Map of soil and climatic surveys of the Pauba Ranch, Riverside County California; Plaintiff's Exhibit No. 33—Tabulation and analysis in re crop adaptation of parts of Pauba, Temecula, Little Temecula and Santa Rosa Ranches.

District acquired any rights in and to the use of water of the Santa Margarita River by any of its filings of applications with the Division of Water Resources.

30. The United States of America likewise denies that the Santa Margarita Mutual Water Company has any rights to the use of water in the Santa Margarita River by reason of the applications which it filed with the Department of Public Works, Division of Water Resources, State Engineer, State of California.

31. The United States of America asserts that within the watershed of the Santa Margarita River system there are 35,000 acres of land above Nigger Canyon and 19,000 acres of land within the watershed of Murrieta Creek and 6,000 acres of land between Camp Pendleton and the head of Temecula Gorge susceptible of irrigation and entitled to water from the Santa Margarita River and that those rights, together with the rights of the Vail Estate and the United States, far exceed the quantities of water available in the Santa Margarita River. The United States of America likewise denies that there is any water available for appropriation or exportation from the watershed of the Santa Margarita River.

32. The defendant Fallbrook Public Utility District in direct violation of the rights to the use of water of the United States in the Santa Margarita River has illegally and in violation of the rights of the United States installed in the channel of that stream a dam and pump and with intake structures is impounding and diverting water to which the United States is legally entitled.

33. The validity of Permit No. 8511, in addition to the other reasons expressed above, is denied by reason of the fact that it was issued with full knowledge of the pendency of the action subsequent to the date that this cause was instituted.

34. Similarly no rights could be invested in the Fallbrook Public Utility District or the Santa Margarita Mutual Water Company by reason of action taken by the State in regard to pending applications.

35. The water diverted from the watershed at the present time for military uses is largely re-diverted to the watershed in the form of sewage effluent which is returned to the basin for recharging the basin and for reuse.

36. The Fallbrook Public Utility District could not initiate rights to the use of water in the Santa Margarita River when it made its filings with the State of California by reason of the fact that it was at the time receiving water in small quantities from that river pursuant to a revocable license from the United States of America.[14]

37. All of the acts of the Fallbrook Public Utility District and of the Santa Margarita Mutual Water Company complained of in this litigation by the United States were taken with full knowledge of the dependency of the United States of America upon the Santa Margarita River as a source of supply for the military establishments in question.

38. The diversions of the Fallbrook Public Utility District are the direct and immediate cause of salt water intrusion, described in the Complaint, which has resulted in the contamination by salt water of two of the wells maintained on Camp Joseph H. Pendleton.

39. Due to the diversions of the Fallbrook Public Utility District, none of the waters of the Santa Margarita River are now reaching Camp Joseph H. Pendleton or the United States Naval Ammunition Depot. By reason of that diversion, the United States Naval Ammunition Depot is without a supply of water causing the United States to suffer irreparable damage and it will continue suffering irreparable damage as long as the Fallbrook Public Utility District continues to maintain its dam across the Santa Margarita River and continues to pump water from that stream.

14. Plaintiff's Exhibit No. 34—Certified copy of Revocable License and Permit to use water from the Santa Margarita River from Rancho Santa Margarita to the Fallbrook Public Utility District; Letter of May 24, 1948 revoking·it.

Response of the United States of America to Contentions of the Fallbrook Public Utility District, Santa Margarita Mutual Water Company and the State of California

1. The United States of America denies the contentions of the Fallbrook Public Utility District, the Santa Margarita Mutual Water Company and the State of California pointing to the fact that the contentions in question are largely conclusions of law to be determined by this Court.

2. The United States of America objects and renews its objection previously made to the amendment by the State of California, Defendant in Intervention, to its answer.

Contentions of Fallbrook Public Utility District

1. Fallbrook Public Utility District denies that plaintiff is making, or that it has made since the acquisition of Rancho Santa Margarita, any riparian uses, or in the future will make any riparian uses of the waters of the Santa Margarita River for the reason that this defendant contends that the military uses to which plaintiff has put and is putting such waters are not riparian uses; and that the water heretofore and now being applied by plaintiff to irrigation and agricultural purposes has not been and is not now being used on lands located within the Santa Margarita watershed.

2. Fallbrook Public Utility District denies that Plaintiff, or its predecessor in interest, acquired or could have acquired, as against this defendant, by use, * or that plaintiff now owns the right to demand that water of the Santa Margarita River be allowed to pass this defendant's diversion point to enable plaintiff to use said water

(a) on lands outside the Santa Margarita River watershed;

(b) for supplying plaintiff's military requirements, including the sanitary, culinary and drinking requirements of its armed forces, and the civilian personnel employed in connection therewith, stationed from time to time at Camp Joseph H. Pendleton, the Naval Ammunition Depot and the United States Naval Hospital;

(c) for storage for future use.

It is the contention of this defendant that neither plaintiff nor its predecessors in interest ever made any appropriation of the water of the Santa Margarita River, under or pursuant to the laws of the State of California (other than the application No. 12576 made by the Navy Department June 30, 1948, to which reference is hereinafter made) and that Plaintiff and its predecessors in interest did not and could not have acquired, as against this defendant any prescriptive rights for the reason that all of Plaintiff's diversions and those of its predecessors in interest were and are down stream from the diversions of this defendant and the lands on which this defendant puts the waters of the Santa Margarita River to use.

3. Fallbrook Public Utility District has made the following applications to the State of California to appropriate water of the Santa Margarita River and the Sandia and Rainbow Creeks, tributaries of Santa Margarita River, and pursuant to the water laws of the State of California:

(1) Application No. 11586, filed October, 11, 1946, to appropriate 2½ cubic feet per second from the Santa Margarita River, which application was approved and permit issued on February 18, 1948, to appropriate and divert from said river for beneficial use not exceeding 2.5 cu. ft. per second, "from about April 1 to November 1 of each year and through the remainder of the year as required for domestic and municipal uses. In case of rotation the equivalent of such continuous allowance for any thirty day period may be diverted in a shorter time if there is no interference with other vested rights."

Thereafter this defendant has exercised its rights under said permit and has now diverted and put to beneficial use the full amount granted under said permit and has acquired the right to continue to so use said full amount.

* or prescription

(2) Application No. 11587 filed October 11, 1946, to appropriate 10,000 acre-feet per annum from the Santa Margarita River, which application was approved and permit issued on April 23rd, 1951, to store for beneficial use within the Fallbrook Public Utility District not to exceed "10,000 acre-feet per annum to be collected between January 1st and December 31st of each year."

Thereafter this defendant has been and now is actively engaged in the acquisition of lands for the dam and reservoir in which to store said water and in the preparation of plans and specifications for the building of said dam.

(3) Application No. 12178 filed November 28, 1947 to appropriate 10,000 acre-feet per annum for storage and beneficial use within the Fallbrook Public Utility District, 500 acre-feet per annum from Rainbow Creek and 9,500 acre-feet from the Santa Margarita River.

That said application is in due form and order, in full force and effect and now pending before and under consideration by the State Engineer and Division of Water Resources, Department of Public Works, State of California and notice of said application is now being published as required by law, and the District is entitled to the issuance of a permit thereon.

(4) Application No. 12179, filed November 28, 1947, to appropriate 10,000 acre-feet of water per annum for storage and beneficial use within the Fallbrook Public Utility District, 1500 acre-feet per annum from Sandia Creek, 8,500 acre-feet per annum from Santa Margarita River.

That said application is in due form and order, in full force and effect and now pending before and under consideration by the State Engineer and Division of Water Resources, Department of Public Works, State of California and notice of said application is now being published as required by law, and the District is entitled to the issuance of a permit thereon.

4. The United States of America, acting by and through the United States Navy Department also filed an application with the State of California on June 30, 1948, being

Application No. 12576 to appropriate 165,000 acre-feet of water per annum from the Temecula Creek-Santa Margarita River for storage at a dam to be built on Camp Pendleton for municipal or military, irrigation and domestic uses

but that said application was filed subsequent to all of the applications of this defendant and is junior in right to the applications and rights of this defendant. A copy of said application is attached hereto and made a part hereof.[1]

5. There exists in said Santa Margarita River excess and surplus waters over and above the actual reasonable requirements of the riparian land owners and those having rights prior to those of this defendant, which excess and surplus waters are subject to appropriation, diversion and use by this defendant.

6. While Fallbrook Public Utility District is primarily an appropriator of water, distributing same to land owners and water users within the boundaries of the District, it is also the owner in fee simple, or is in the process of acquiring title in fee simple, to the hereinafter described tracts of land which are situated within the watershed of the Santa Margarita River and said District claims water rights therefor, in the several amounts hereinafter set out, either as being riparian to the Santa Margarita River and its tributaries, or, as being rights to the underground water percolating beneath said tracts of land.

The District is the owner in fee of the following tracts of land situated in the County of San Diego, State of California, and more particularly described as follows:

*Parcel 1.* The South 248.09 feet of that portion of the North 480 feet of the Northwest Quarter of the Northeast Quarter of Section 25, Township 9 South, Range 4 West, San Bernardino Meridian, lying and

1. Defendant Fallbrook Public Utility District Exhibit No. H, Application No. 12576 of United States of America to appropriate water.

being West of the center line of the County Highway as described in Decree of Condemnation in Superior Court of San Diego County, Case No. 17550, a certified copy of which was recorded May 20, 1912, in Book 500, page 89 of Deeds, containing 4 acres, more or less, with a right to water for use thereon up to 12 acre-feet per annum.

*Parcel 2.* The East One Hundred Thirty (130) feet of the West Eleven Hundred Fifty-two (1152) feet of the Northwest Quarter of the Northwest Quarter of Section 7, Township · Nine South, Range 3 West, San Bernardino Meridian, containing 3.94 acres more or less, with a right to water for use thereon up to 12 acre-feet per annum.

*Parcel 3.* The North one-half of Block "S" of Bartlett's Addition to West Fallbrook No. 1, according to Map thereof No. 470, filed in the office of the Recorder of said San Diego County, January 4th, 1888, containing .38 acres more or less, with a right to water for use thereon up to one acre-foot per annum.

*Parcel 4.* All that portion of Lot 2, being the Northwest Quarter of the Southwest Quarter of Section 18, Township 9 South, Range 3 West, S. B. M. described as follows: Commencing at a point on the West line of said Section 18 distant thereon 215 feet Northerly from the Southwest corner of said Lot 2, thence at right angles Easterly, 185 feet to the true point of beginning, thence at right angles Northerly, being along a line parallel with said West line of said Section, 200 feet, thence at right angles Easterly, 217.8 feet, thence at right angles Southerly, being along a line parallel with said West line of said Section, 200 feet, thence at right angles Westerly, 217.8 feet to the true · point of beginning. Also an easement and right of way, 16 feet wide, connecting the South line of the above described property with the South line of said Lot 2, the West line of said 16 foot strip being the Southerly prolongation of the West line of the above described property, containing one acre more or less, with a right to water for use thereon up to 3 acre-feet per annum.

*Parcel 5.* All that portion of Section 17, Township 9 South, Range 3 West, S. B. M. described as follows: Commencing at a point in the South line of said Section 17, distant N 89° 56′ 30″ E. 159.84 feet from the SW corner of the SE¼ of said Section 17; Thence at right angles to said South line of said Section 17, N. 0° 03′ 30″ West 873.15 feet to a point; Thence N 89° 56′ 30″ E 210 feet to a point; Thence S 0° 03′ 30″ E 210 feet to a point; Thence S 89° 56′ 30″ W 194 feet to a point; Thence S 0° 03′ 30″ E 663.15 feet to a point in the South Line of said Section 17; Thence S 89° 56′ 30″ W 16 feet along the South line of said Section 17 to the point of beginning, containing 1.25 acres more or less, with a right to water for use thereon up to 4 acre-feet per annum.

*Parcel 6.* All that portion of the SW¼ of the SE¼ of Section 24, Township 9 South, Range 4 West, S. B. M. described as follows: Commencing at a point which is South 88° 56′ East 670 feet and North 0° 31′ East 344.60 feet from the South Quarter corner of Section 24, Twp. 9 South, Range 4 West; Thence North 0° 31′ East 75 feet; Thence South 89° 15′ East 275 feet; Thence South 0° 31′ West 74.84 feet; Thence North 89° 17′ West 275 feet to point of commencement, containing .47 acres more or less, with a right to water for use thereon up to 1.5 acre-feet per annum.

Fallbrook Public Utility District has heretofore commenced an action in the Superior Court of the State of California in and for the County of San Diego, to condemn sixty-five (65) parcels of land for dam and reservoir sites for storing waters of the Santa Margarita River, which said action is now pending and in which action this defendant has taken possession of three of said tracts, hereinafter described, under an order of court after depositing with the Clerk of said court the amounts of money specified in said order as adequate to secure to the owner of each of said tracts payment of just compensation for such taking and any damages incident thereto. The tracts of land for which compensation has been paid into court and

possession thereof taken by this defendant are all located in San Diego County, State of California, and are more particularly described as follows:

*Parcel 1.* The Northeast Quarter of the Northeast Quarter of Section 12, in Township 9 South, Range 4 West, San Bernardino Meridian, according to United States Government Survey approved January 15, 1892, containing 40 acres more or less with a water right to water for use thereon up to 120 acre-feet per annum.

*Parcel 2.* Portions of the Northwest Quarter of the Northeast Quarter of Section 12, and the Southeast Quarter of the Northeast Quarter of Section 12, in Township 9 South, Range 4 West, San Bernardino Meridian, according to United States Government Survey approved January 15, 1892, containing 77 acres more or less with a water right to water for use thereon up to 230 acre-feet per annum.

*Parcel 3.* The West 1022 feet of Lot 1, (Northwest Quarter of the Northwest Quarter) Section 7, and the Southwest Quarter of the Northwest Quarter, Section 7, Township 9 South, Range 3 West, San Bernardino Meridian, according to United States Government Survey thereof, containing 77 acres more or less with a water right to water for use thereon up to 230 acre-feet per annum.

This defendant intends to prosecute said action in condemnation to final judgment and acquire title in fee simple to all of said 65 tracts of land, together with the water rights belonging thereto.

7. Fallbrook Public Utility District was not, nor was any of its predecessors in interest, a party to the action entitled: Rancho Santa Margarita v. Vail No. 42850 in the Superior Court of the State of California in and for the County of San Diego, and Fallbrook Public Utility District is not bound by nor are any of its rights or interests restricted, limited or affected by the Stipulated Judgment entered in said action, copy of which is attached to and made a part of Plaintiff's complaint as Exhibit "A". That as against Fallbrook Public Utility District said Stipulated Judgment and the stipulation between plaintiff and the Vail interests signed October 23rd, 1951 and filed on October 24th, 1951, are inadmissible as evidence.

8. Fallbrook Public Utility District, pursuant to the Court's direction, preferred for inclusion in the "Agreed Facts" a statement and tabulation of the District's records of diversions made by it from the Santa Margarita River, but Plaintiff declined to allow them to be included herein under the heading of "Agreed Facts" although plaintiff made no objection to the accuracy of the figures. Therefore in order to comply with the Court's direction, said data is inserted at this point under this defendant's contentions and said statement attached as an exhibit of defendant Fallbrook Public Utility District.[2]

9. Fallbrook Public Utility District has distributed the water diverted by it from the Santa Margarita River primarily for use on lands situated within that portion of the District which lies within the Santa Margarita River watershed. The area of the Fallbrook Public Utility District which lies within the Santa Margarita River watershed consists of approximately 1800 acres. The quantities of water so diverted from the Santa Margarita River were found to be inadequate to meet the requirements of the lands and water users within said area and Fallbrook Public Utility District has continuously imported large quantities of "foreign water" for distribution and use in said area. Since 1938 the District has diverted from the San Luis Rey River for use within the District, the quantities set out in Defendant's Exhibit No. J, attached hereto and made a part hereof.[3] Since 1947 this defendant has purchased Colorado River water for use within the District in the quantities set out in Defendant's Exhibit No. K attached

2. Defendant Fallbrook Public Utility District Exhibit No. I, Statement of Records of Diversions of Water from Santa Margarita River.

3. Defendant Fallbrook Public Utility District Exhibit No. J, Statement of Records of Diversions of Water from the San Luis Rey River.

hereto and made a part hereof.[4] The said "foreign waters" imported into and distributed by the District for use upon lands within the Santa Margarita watershed were in such quantities that the return flow therefrom, together with the return flow from the Santa Margarita River water likewise distributed by the District for use upon land within said watershed were at least equal to the amounts diverted by this defendant from the Santa Margarita River so that its flow on and under the plaintiff's property was not and are not diminished by this defendant's diversions from the Santa Margarita River.

10. The Fallbrook Public Utility District began its diversions of water from the Santa Margarita River with the full knowledge of plaintiff's predecessor in interest. At all times since the diversion of said water by this Defendant commenced, the same has been used by said District not only for domestic purposes and uses but also for the irrigation of lands within the District. That the water requirements of the district have steadily increased with the growth and development of the Fallbrook and surrounding area and its diversions from the Santa Margarita River have increased proportionately. That said increase in water requirements represents both the growth of the orchards from young plantings to maturity and other plantings of new orchards on lands not previously planted as well as the increase in population of the community. The said District has expended large sums of money in purchasing a site on the Santa Margarita River for construction and installation of its pumping plant, for the purchase and installation of said pumping plant, for expansions and additions to said pumping plant in order to increase its capacity, for the purchase of a reservoir site and for the construction of said reservoir, for the construction and installation of a pipe line connecting said pumping plant and said reservoir, and for the construction and installation of a distribution system from said reservoir to the several land owners and water users within the district located within the Santa Margarita River watershed. That all of the lands within the Fallbrook Public Utility District and particularly the 1800 acres thereof within the Santa Margarita watershed (except the small portion thereof occupied by the town of Fallbrook) are planted to permanent orchards of citrus, avocados and other varieties of fruit trees which require regular and continuous irrigation for the reason that all of the Fallbrook Public Utility District lies within a semi-arid region where the rainfall alone is insufficient to produce crops. Plaintiff, and its predecessor in interest, at all times had knowledge of the diversions made by the District from the Santa Margarita River and that the water so diverted was at all times being used extensively for irrigation as well as for domestic purposes. The area served by the Fallbrook Public Utility District is approximately 8,000 acres. The population of the District dependent wholly or in large part upon the water distributed by the District is approximately 5,000. The aggregate assessed valuation (primarily small farms and homes) is $4,396,690.

That the Fallbrook community, together with orchards and crops growing upon the lands within the Fallbrook Public Utility District are dependent upon the Santa Margarita River as one of their primary sources of supply of water and would suffer great and irreparable damage, injury and loss if that supply were cut off. All of the foregoing facts and matters are and have been common knowledge and public records and at all times known to the plaintiff and its predecessor in interest and plaintiff is now estopped and barred from objecting to the continued diversion and use of said water for said public purposes, or from complaining that such diversions and uses are, or have been, without right or from asking that said diversions be now enjoined.

11. Fallbrook Public Utility District contends that plaintiff's predecessor in in-

---

4. Defendant Fallbrook Public Utility District Exhibit No. K, Copies of records of San Diego County Water Authority of Colorado River Water sold to Fallbrook Public Utility District.

terest conveyed in fee simple to and that the Atchison, Topeka & Santa Fe Railway Company now owns title in fee simple to a strip of land running northerly and southerly through and across the Rancho Santa Margarita, underlying and occupied by the main line of said Company running from Los Angeles to San Diego and also said plaintiff's predecessor in interest conveyed in fee simple to and the Atchison, Topeka & Santa Fe Railway Company now owns title in fee simple to a strip of land beginning at a point on said main line commonly known as Fallbrook Junction running thence easterly and northeasterly through and across said Rancho Santa Margarita to Fallbrook, California and underlying and occupied by said Fallbrook branch line. That said transfer and conveyance by plaintiff's predecessor in interest to said Atchison, Topeka & Santa Fe Railway Company of said strips of land constituted a severance of a large portion of said Rancho Santa Margarita from the Santa Margarita River so that the portion thereof lying southerly and easterly of said Fallbrook branch line was and is no longer in contact with the Santa Margarita River and does not have riparian rights in and to the waters of said river and the portion westerly of said main line was and is no longer in contact with that portion easterly thereof and is not entitled to water produced on said easterly portion.

12. Fallbrook Public Utility District contends that any shortage of water which may have been experienced or suffered by plaintiff in the supply to which it may have been entitled from the Santa Margarita River was not caused by diversions made by this defendant but was the result of plaintiff's own excessive and unreasonable use of the waters of the said river and its mismanagement and misuse of its wells and the underground basins in which the same are located.

13. This defendant contends that its rights to the waters of the Santa Margarita River under its applications to, and permits from, the State of California are prior to plaintiff's rights

(a) to use any of said waters outside the watershed of the Santa Margarita River

(b) to store any of said water for future use

(c) to use any of said waters for military purposes, to-wit: to supply the domestic, municipal and quasi-municipal requirements of its armed forces, and the civilian personnel performing duties in connection with said armed forces and for supplying water for radiators of automobiles, tanks and other self-propelled machines requiring water for their mechanical operation or maintenance.

14. Fallbrook Public Utility District contends that the lands of plaintiff lying within the watershed of DeLuz Creek and Fallbrook Creek respectively, cannot be taken into consideration in determining the amounts of water of the main stream of the Santa Margarita River to which plaintiff may be entitled to have pass the diversion points of this defendant in order to meet plaintiff's riparian requirements.

15. Fallbrook Public Utility District contends that the State of California has not ceded exclusive jurisdiction over the entire Rancho Santa Margarita to the United States but only to that portion thereof actually occupied and used for military establishments and contends that plaintiff does not have exclusive jurisdiction over several thousand acres which have been continuously leased out by plaintiff to farmers for growing commercial agricultural crops thereon.

16. This defendant contends that plaintiff's rights, as owner of Rancho Santa Margarita, are no greater than those which a private owner of the same property would have and that plaintiff's right to the use of the waters of the Santa Margarita River system are not increased by virtue of plaintiff's sovereignty military necessity, or by reason of cession of jurisdiction by the State of California over all or any part of said Rancho Santa Margarita.

17. This defendant contends that plaintiff's rights, as owner of riparian lands, are correlative with the rights of all other

riparian land owners on the Santa Margarita River system and are limited and restricted to an equitable share only of the flow of the river which may actually be available from day to day, week to week and month to month.

18. This defendant contends that where several parcels of land have been acquired separately and at different times as was the case when plaintiff purchased the Rancho Santa Margarita, each parcel of land must be considered as a separate unit in determining its water rights and that water produced on one parcel of land cannot be transferred or used on another parcel of land to the injury of the rights of third persons, nor can water be demanded for such use and purpose.

19. This defendant contends that the Stipulated Judgment did not give plaintiff's predecessor in interest, nor does it give plaintiff, as against this defendant, any right, title or interest in or to the waters stored and impounded or which may be stored or impounded in the Vail reservoir constructed by the Vail interests in Nigger Canyon and plaintiff does not now own any right, title or interest in or to waters stored or to be stored in said reservoir or in or to waters released therefrom, other than such rights as plaintiff may have as the owner of riparian lands; that said Stipulated Judgment did not and does not, as against this defendant, increase in any way plaintiff's rights in and to the waters of the Santa Margarita River system or its control over the same beyond and above what plaintiff would have if said Stipulated Judgment had never been made and entered.

20. This defendant desires to supplement and add to its Number 10 contention hereinbefore set forth and state these additional facts: During the year 1941 the United States Navy Department with full knowledge of the fact that Fallbrook Public Utility District was diverting water from the Santa Margarita River as set out in said Contention No. 10, negotiated and executed a Contract with the Fallbrook Public Utility District (San Diego Contract N244s–39380) requiring this district to furnish water service to the Naval Ammunition Depot located on the Rancho Santa Margarita, and pursuant to said Contract, the District, at its own expense, installed, constructed and maintained the necessary water facilities for performing said contract, including the necessary diversion works in the Santa Margarita River, pumps, pipelines, service connection line and meter to enable the District to supply the additional quantities of water which it had obligated itself to furnish. Said contract remained in full force and effect until by letter of February 26, 1947 its cancellation was requested effective February 21st, 1947. Also with full knowledge of Fallbrook Public Utility District's diversion from the Santa Margarita River, plaintiff requested deliveries of such water, accepted said deliveries and paid for the water furnished to the Federal Housing Unit at Fallbrook, California.* That plaintiff is now estopped and barred from objecting to the diversions by this defendant from the Santa Margarita River or from complaining thereof or for asking that said diversions be now enjoined.

21. Fallbrook Public Utility District contends that plaintiff is not entitled to raise, as it has attempted to do, the question of the validity of the District's application to appropriate water from the Santa Margarita River or of the permits issued by the State of California therefor since all such permits are issued subject to vested rights, and because of Plaintiff's stipulation that the rights of the United States are to be measured in accordance with the laws of the State of California. If it should be held that plaintiff is entitled to attack the validity of District's applications and permits and to raise the question of due diligence, and if it should be held for any reason that said applications and

---

* That as late as April and May, 1952, Plaintiff requested deliveries from Fallbrook Public Utility District and received from it substantial quantities of water for use at the U. S. Naval Ammunition Depot which it knew or could have known as being diverted from the Santa Margarita River by the District under claim of right.

permits are not valid, then this defendant contends that plaintiff's Application No. 12576, filed June 30th, 1948 is not valid and that plaintiff has failed to exercise due diligence in the prosecution of its said application for 165,000 acre-feet of water per annum from the Santa Margarita River.

22. This defendant has not yet been accorded the privilege or opportunity of having its experts examine, investigate and study the physical and geological formation of the basins or basin underlying that portion of the Rancho Santa Margarita lying within the watershed of the Santa Margarita River. Accordingly, until Fallbrook Public Utility District is otherwise advised by its experts, contends that there exists three separate basins within the Santa Margarita watershed on plaintiff's property. That said basins have other separate sources of water replenishment other and independent of the main stream of the Santa Margarita River which passes this defendant's points of diversion.

23. Fallbrook Public Utility District contends that the principal use by plaintiff of Santa Margarita River water from the time plaintiff first acquired the Rancho Santa Margarita has been for supplying * the domestic, sanitary, culinary and drinking requirements of the armed forces and civilian personnel used in connection therewith stationed from time to time at Camp Joseph H. Pendleton, Naval Ammunition Depot and the United States Naval Hospital. The numbers of said armed forces and civilian personnel vary from time to time substantially in the manner set out in Defendant's Exhibit No. L, supplied to it by plaintiff and attached hereto and made a part hereof.[5]

24. Fallbrook Public Utility District disputes the contentions of the United States of America hereinbefore set forth except so far as the same are expressly admitted in the Statement of "Agreed Facts" contained in this order.

25. By consenting to the inclusion of references to plaintiff's exhibits in the Statement of "Agreed Facts" Fallbrook Public Utility District does not agree to the truth, accuracy or correctness of any of the figures, statements or representations therein contained or set out, for the reason that this defendant has not been accorded the privilege of seeing, examining or studying the same and accordingly reserves the right to criticize and refute the truth, accuracy and correctness of any of the figures, statements or representations contained in plaintiff's said exhibits.

26. Fallbrook Public Utility District has heretofore objected to the trial of its issues in this action and the determinations of its rights separate from and independent of the trial and determination of the rights of the other defendants in and to the waters of the Santa Margarita River and does not waive its rights to reassert that objection at all proper times and places by participating in this pre-trial conference and in the separate trial under this order.

27. This defendant contends that no further proceedings should be had or taken in this action during the current fiscal year as to do so is and will be in violation of the intentions of Congress and the express prohibition contained in Public Law 495, Chapter 651, 82nd Congress, 2nd Session, Section 208(d) of H.R. 7289, 66 Stat. 560, approved by the President of the United States July 10, 1952.

28. This defendant may have other contentions and reserves the right to present additional contentions later and as the trial progresses and the occasion arises justifying the same or shows the necessity therefor.

29. Fallbrook Public Utility District contends that it has acquired a prescriptive right to divert from the Santa Margarita River the quantities of water which it has heretofore diverted from said river in the amounts shown on its Exhibit No. I, being a copy of its record of diversions commencing in 1925.[6]

---

* non-riparian uses and purposes, to-wit:

5. Defendant Fallbrook Public Utility District Exhibit No. L—Population tabulation.

6. Defendant Fallbrook Public Utility District Exhibit No. I, Statement of Records of Diversions of Water from Santa Margarita River.

Contentions of the Santa Margarita Mutual
Water Company

1. That Plaintiff and its predecessors in interest have not and could not acquire any rights to the use of water of the Santa Margarita River System by prescription or adverse possession as against any defendant or defendants in the above entitled action. That all water which has been extracted or diverted from the Santa Margarita River System by Plaintiff has been diverted, extracted and used downstream from the lands and the point of extraction and diversion of water by all defendants.

2. That the Plaintiff and its predecessors in interest could not acquire any rights to the use of water or to the waters of the Santa Margarita River System by appropriation without complying with the local rules, regulations, customs and the laws of the State of California relative to and governing the appropriation of water then in effect at the time said appropriation was made and perfected.

3. That this action is an action by the Plaintiff to quiet its title to the use of water or waters of the Santa Margarita River System and to have its rights declared and adjudicated by the court and that the Plaintiff must recover upon the strength of its own title and cannot recover on the weakness or weaknesses of the Defendant's title.

4. That the plaintiff has not and could not acquire any greater right to the use of water than that possessed by a private proprietor under the laws of the State of California and that the Plaintiff does not have any rights by virtue of sovereignty, exclusive jurisdiction, or by reason of the cession of jurisdiction by the State of California to use waters of the Santa Margarita River System for non-riparian purposes or on non-riparian lands and that Plaintiff is limited to the place of use of said waters and the quantities of said waters to the same extent as a private land owner.

5. In an action to quiet title to the waters on a non-navigable stream the question of exclusive jurisdiction or sovereignty can neither enlarge or curtail the rights of the United States and that any

and all statements contained in the Complaint relative to exclusive jurisdiction should be stricken and should not be considered by the Court.

6. That the safe yield of the basin or basins lying within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot, and of the U. S. Naval Hospital has always exceeded the quantities of water put to beneficial use by the Plaintiff and its predecessors in interest on the lands overlying said basins and on the lands lying within the watershed of the Santa Margarita River.

7. That the Plaintiff has no right as against a riparian owner or a prior appropriator to extract water from the basin or basins referred to as the Upper or O'Neill Basin, the Chappo or Home Ranch Basin, or Ysidora Basin for beneficial use on lands which do not overlie said basins.

8. That the underground basin or basins located within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot and the U. S. Naval Hospital are not supported by the surface or sub-surface flow of the Santa Margarita River.

9. That the lands lying within the watershed of DeLuz Creek and Fallbrook Creek do not constitute and are not a portion or part of the watershed of the Santa Margarita River in considering the riparian requirements of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot and the U. S. Naval Hospital, and the correlative rights and the needs of upstream owners and appropriators diverting upstream from the junction of said tributaries of the Santa Margarita River.

10. That at all times the flow of the Santa Margarita River in the state of nature is and has been sufficient to supply all waters required by the Plaintiff for beneficial use on its riparian lands.

11. That the Plaintiff and its predecessors in interest have not acquired by prescription or appropriation the right to divert from the Santa Margarita River waters for storage either underground or

surface, and has not acquired the right to store waters in Lake O'Neill, an artificial reservoir.

12. That the Plaintiff is not entitled to any greater quantity of water by virtue of ownership of land which it has dedicated to and is using exclusively for Military purposes than it can put to beneficial use of those lands for Military purposes and the fact that because lands might be used for agricultural purposes cannot increase or decrease the quantity of water to which Plaintiff is entitled by reason of the ownership of said lands so long as those lands are used exclusively for Military purposes.

13. Quantities of water to which Plaintiff is entitled by virtue of its riparian ownership on any parcel of land for which it has no present beneficial use on said parcel cannot be used to supplement the needs of Plaintiff on any other parcel of land which it may own.

14. Plaintiff as a riparian owner only has a correlative right to the use of waters of the Santa Margarita River System and the quantity of waters which Plaintiff is entitled to use varies from day to day, from week to week, from month to month, and from year to year.

15. That Plaintiff does not have by virtue of its riparian ownership of lands which are riparian to the Santa Margarita River System the right to divert, impound, and store, the surface flow or the subsurface flow of the Santa Margarita River and that it has not acquired any rights by prescription, adverse possession, or appropriation to divert, store, or impound the waters of the Santa Margarita River System.

16. That the court in this proceeding cannot determine or adjudicate the legality or sufficiency of any application filed with the State of California, Department of Public Works, Division of Water Resources, State Engineer, to appropriate water of the Santa Margarita River System or determine the sufficiency or regularity of any proceedings pursuant thereto, but that this court is limited to determining whether there are waters of the Santa Margarita River System subject to and which could be used under and pursuant to any permit or license which might be issued or granted by the State of California and the priority of any and all permits and licenses which have been or might be issued by the State of California pursuant to existing applications to appropriate waters of the Santa Margarita River System.

17. That the stipulated judgment entered into by the Plaintiff's Predecessor in Interest and the Vail Interests which is attached to Plaintiff's Complaint as Exhibit A and the stipulation heretofore, by order of the Court filed on July 8, 1952 and which is set forth in the agreed statement of facts is incompetent, irrelevant, and immaterial and cannot tend to prove or disprove any of the issues between the Plaintiff and the Defendant, Santa Margarita Mutual Water Company and that the controversy between the Defendant, Santa Margarita Mutual Water Company, and the Plaintiff must be determined and adjudicated as though said stipulated judgment and said stipulation had never been executed.

18. That Plaintiff cannot acquire any right, title or interest, claim, lien, or demand in or to any of the waters in the Santa Margarita River which may be stored, impounded, or collected in the Nigger Canyon Reservoir by the Vail Defendants as against the Defendant Santa Margarita Mutual Water Company.

19. That Plaintiff has no right by virtue of the terms of the stipulated judgment attached to Plaintiff's Complaint as Exhibit A or by reason of the stipulation entered into by the Defendant Vails and the Plaintiff and approved by an order of this court of July 8, 1952 to use water of the Santa Margarita River System outside the watershed of the Santa Margarita River.

20. That the acreage which can be irrigated by the Vails, Defendants, is not limited by the amount of water available to said Defendants but is limited and controlled by the terms of an agreement entered into between the Plaintiff's predecessors in interest and said Vail Defendants and which is attached to Plaintiff's Complaint as Exhibit A.

21. That any and all rights which the Vail Defendants may have to impound, divert, and store water of the Santa Margarita River System and their rights to use said water and the lands upon which said water may be used are controlled by the terms of the permit issued by the State of California, Department of Public Works, Division of Water Resources, State Engineer. And that neither said Vail Defendants or the Plaintiff in this action has acquired any rights to store, divert, or impound any waters of the Santa Margarita River System at the Nigger Canyon Reservoir site for use or to use any of the water so stored or impounded on or for the benefit of Camp Joseph H. Pendleton, U. S. Naval Ammunition Depot, or the U. S. Naval Hospital.

22. From time immemorial large quantities of the surface and subsurface flow of the Santa Margarita River have been discharged into the Pacific Ocean and thereby lost resulting in an economic loss of water of the Santa Margarita River.

23. That the principal sources of water of the Santa Margarita River System available to the Plaintiff during the dry season of the year is obtained from the underground water basins herein referred to as the Upper or O'Neill Basin, the Chappo or Home Ranch Basin and the Ysidora Basin. That no waters are available or can be diverted during the dry seasons from either the surface or subsurface flow of the Santa Margarita River. other than those flood waters of the Santa Margarita River which Plaintiff has diverted and stored in Lake O'Neill, an artificial reservoir.

24. The Plaintiff cannot and has not put to beneficial use more than 1200 acre feet per year on lands lying within the watershed of the Santa Margarita River.

25. That in the controversy between the United States of America and the Defendant Santa Margarita Mutual Water Company, the Fallbrook Public Utility District, and the State of California in determining whether there is a surplus available for appropriation that the acreage of riparian land owned by the Vail Defendants and the quantity of water which can be put to beneficial use on said land is immaterial, incompetent, and irrelevant because the quantities of water available to said Vail Defendants and which can be put to use by them is limited by the terms of the stipulated judgment attached to Plaintiff's Complaint as Exhibit A.

26. That the flood waters of the Santa Margarita River which cannot be put to beneficial use by the riparian owners without cyclic storage are available for appropriation under the laws of the State of California.

27. That a military use is not a riparian use and that waters used for military purposes on Camp Joseph H. Pendleton and U. S. Naval Ammunition Depot are not used by virtue of the riparian ownership of the lands owned by Plaintiff and that if the court should decide that a military use is a riparian use then a use for military purposes is junior and subsequent to the use of water of said river for agricultural, domestic, and livestock purposes.

28. That no portion of the lands being occupied by the U. S. Naval Ammunition Depot are used for agricultural purposes.

29. That no portion of the lands located within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton are used or devoted to agricultural purposes.

30. That the lands located within the area of Camp Joseph H. Pendleton and within the watershed of the Santa Margarita River do not derive any substantial benefit from sub-irrigation or from being overflowed by flood waters during periods of high precipitation.

31. That there are less than 12,000 acres of land lying within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot and the U. S. Naval Hospital which are susceptible of practical and profitable irrigation.

32. That the lands within the watershed of Windmill Creek and Palm Canyon are within the watershed of the San Luis Rey River and not within the watershed of the Santa Margarita River.

33. That the reasonable requirements per man per day for personnel within Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot is 75 gallons of water per day.

34. Insofar as any contentions of the United States of America conflict with the terms of the Stipulation entered into between the State of California and the United States of America, the United States is precluded from introducing any evidence or raising any legal contentions that would be at variance with that Stipulation.

35. Santa Margarita Mutual Water Company adopts by reference Contentions No. 1 to 8, inclusive, of the State of California and the following Contentions of the Fallbrook Public Utility District: Nos. 1, 2, 4, 5, 7, 8, 11, 12, 13, 14, 15 16, 17, 18, 19, 21, 22, 24, 25 and 26.

36. The United States of America filed a protest to the applications to appropriate water filed by the Santa Margarita Mutual Water Company, a corporation, with the State of California, Department of Public Works, Division of Water Resources, State Engineer, which protest has never been withdrawn or dismissed and is still pending.

37. On October 4, 1946, the defendant Santa Margarita Mutual Water Company, a corporation, filed a bona fide application with the Division of Water Resources, Department of Public Works of the State of California, being Application No. 11578, and that said company was not and has never been notified by the Division of Water Resources of any defect in said application and that said company within the time as extended by the Division of Water Resources completed said application. That said application is now pending before the Division of Water Resources of the State of California, is in good standing and has never been withdrawn, revoked or dismissed.

38. On November 12, 1947, the defendant Santa Margarita Mutual Water Com-

pany, a corporation, filed a bona fide application with the Division of Water Resources, Department of Public Works of the State of California, being Application No. 12152, and that said company was not and has never been notified by the Division of Water Resources of any defect in said application and that said company within the time as extended by the Division of Water Resources completed said application and that notice of said application was duly and regularly published pursuant to the rules and regulations of the Division of Water Resources of the State of California.[1] That said application is now pending before the Division of Water Resources of the State of California, is in good standing and has never been withdrawn, revoked or dismissed.

39. That a notice to appropriate water filed with the State of California, Department of Public Works, Division of Water Resources, State Engineer, creates a property right under the laws of the State of California and under the laws of the United States of America sufficient to justify the applicant to institute and maintain a quiet title suit to the waters of a river against a riparian owner and appropriator or a person who has gained the right to use the waters of a stream by virtue of prescription or adverse possession.

40. That an appropriator or a riparian owner or a user who has acquired rights by adverse possession or prescription is not in a position and cannot attack the validity of an application filed with the Division of Water Resources of the State of California prior to the issuance of a permit and then only if they have filed a protest to the granting of said application within the period of time designated by the Division of Water Resources and that prior to the issuance of said permit, no attack can be made on the feasibility of the project, the economic soundness of the project or the place of use of the water or the quantity of water which can be put to beneficial use.

1. Defendant Santa Margarita Mutual Water Company Exhibit No. D, Affidavit of publication of notice of application by the Fallbrook Enterprise; Defendant

Santa Margarita Mutual Water Company Exhibit No. E, Notice of application and affidavit of publication in the Elsinore Valley Sun.

41. The Congress of the United States of America has expressly subjected itself in respect to the use of waters on property belonging to the United States of America to the local rules, regulations and laws of the State of California.

42. That the protests filed with the Division of Water Resources by the United States of America protesting granting of a permit or permits to the Santa Margarita Mutual Water Company were not filed within the time specified by the Division of Water Resources of the State of California.

Contentions of the State of California.

1. The United States has only such a limited jurisdiction over the military reservations in controversy as has been ceded to the United States under the laws of the State of California.

2. The fact that the United States has been ceded certain limited jurisdiction over the military reservations in controversy does not entitle the United States to use the water of the Santa Margarita River system which it has the right to use, in any other manner, on any other place, or for any other purpose than that to which a private individual or corporation would be entitled, if it owned the same land and water rights as the United States does own, or than the United States would have had in the absence of such cession.

3. Specifically, the fact of such cession of a limited jurisdiction does not entitle the United States to use water, which it is entitled to use as a riparian, upon non-riparian lands.

4. The fact of such cession of limited jurisdiction is immaterial to any issue in the cause.

5. As provided in Section 102 of the Water Code of California, intervenor State of California is the absolute owner of all water within the State, provided that the right to use water may be acquired in any manner recognized by the law of California. Intervenor is also the owner of the right of use of all water within the State to which other rights of use do not exist. Intervenor is also owner of the right of reversion of any rights of use of such water which may be forfeited or otherwise terminated for non-use or otherwise.

6. The public interests and welfare require that in the decree herein the Court define and declare each and every water right involved herein as against each and every other water right herein involved.

7. Under the law of California, among other things;

(a) Water rights of riparians inter se are correlative.

(b) Water can be demanded under a riparian right only for use on riparian land.

(c) Water can be demanded under a riparian right only for proper riparian uses and purposes.

(1) Storage of water is not a proper riparian use.

(2) Military use is not a proper riparian use.

(d) One cannot obtain a prescriptive right as against users upstream from him.

(e) An appropriator can take and use any water belonging to riparians, but not currently used by them.

(f) One cannot, since the effective date of the Water Commission Act in 1914, obtain a water right by use alone.

(g) The stipulated judgment between Rancho Santa Margarita, Inc. and the Vails has no force or effect except as between the parties to that case and those in privity with them, and consequently is not admissible in evidence as against the present defendants.

8. The issues in this case are defined and limited in conformity with the statements contained in the stipulation made between the State of California and the United States of America, dated November 29, 1951.

9. If it develops from the evidence that a "physical solution" which will reasonably and fairly protect the water supply to which plaintiff is entitled as a riparian, or otherwise in priority to defendants, can be found and practicably effected at the expense of defendant appropriators, then plaintiff is not entitled to an injunction against such defendant appropriators restraining them from using, to the extent of their lawful appropriative rights, waters surplus to plain-

tiff's riparian or other prior rights. The term "physical solution", as used in this paragraph has the meaning in which it is used in the decisions in water cases of the Supreme Court of California since the year 1928.

Facts disputed by the United States of America.

The United States of America denies:

1. That there is water in the Santa Margarita River available for appropriation or exportation from the watershed of the Santa Margarita River system by the defendants Santa Margarita Mutual Water Company or the Fallbrook Public Utility District.

2. That the Santa Margarita River is or ever has been one of the principal sources of supply of water for the lands within the Fallbrook Public Utility District and for the people residing within that district.

3. That the Fallbrook Public Utility District has since the year 1922 supplied irrigation and domestic water from the Santa Margarita River or from any other source to the lands located within its boundaries and to the people living therein but rather that it was not until the year 1943 that the Fallbrook Public Utility District delivered any water from the Santa Margarita River and that water was diverted pursuant to a gratuitous and revocable license for 10 miner's inches solely for domestic purposes from the United States of America.

4. That the Fallbrook Public Utility District can exercise any of its alleged rights in the Santa Margarita River without encroaching upon the vested rights to the use of water of the United States in that stream.

5. That the Fallbrook Public Utility District can divert during the irrigation season from the normal flow of the Santa Margarita River without encroaching upon the vested rights to the use of water of the United States of America including but not limited to the three cubic feet per second of water that the Vail Estate is obligated to deliver to the United States pursuant to and by reason of the Stipulated Judgment, Exhibit A of the complaint.

6. That the Fallbrook Public Utility District has diverted 1,800 acre feet of water per annum from the Santa Margarita River and asserts that such quantities of water as were diverted by that district were those which would have descended to the United States were it not for the diversion of it by the Fallbrook Public Utility District.

7. That the Fallbrook Public Utility District has exercised due diligence in the prosecution of its alleged claim of right to impound 10,000 acre feet of the Santa Margarita River pursuant to Permit No. 8511, the validity of which is denied by the United States.

8. That the Fallbrook Public Utility District has exercised due diligence in the prosecution of its alleged claim of right to impound 10,000 acre feet of the Santa Margarita River and Rainbow Creek pursuant to Application No. 12178, the validity of which is denied by the United States.

9. That the Fallbrook Public Utility District has exercised due diligence in the prosecution of its alleged claim of right to impound 10,000 acre feet of the Santa Margarita River and Sandia Creek pursuant to Application No. 12179, the validity of which is denied by the United States.

10. That the Fallbrook Public Utility District could exercise the alleged right to divert from the Santa Margarita River 2½ second feet of water or could construct the dam which it allegedly proposes to construct to impound 10,000 acre feet of water or exercise the alleged rights described in its Applications No. 12178 and No. 12179 without:

a. Encroaching upon the riparian rights of the United States, including the rights historically enjoyed by the United States and its predecessors in interest of having the surface area of the basin underlying Camp Pendleton and the other military establishments naturally irrigated by overflow from the Santa Margarita River and sub-irrigated by the high water table of the basin last mentioned;

b. Encroaching upon the right of the United States to have recharged the basin

underlying the military establishments in question;

c. Encroaching upon the right to the use of water provided for in the Stipulated Judgment, including but not limited to the three second feet which the Vail Estate delivers pursuant to that document; and

d. Encroaching upon the rights to divert water from the watershed of the Santa Margarita River which have been historically exercised by the United States of America and its predecessors in interest.

11. That the Santa Margarita Mutual Water Company could divert water in accordance with its alleged plans without encroaching upon the vested rights to the use of water of the United States mentioned above in connection with the encroachments and threatened encroachments by the Fallbrook Public Utility District.

12. That the Santa Margarita Mutual Water Company could practically or economically carry out what counsel for the Fallbrook Public Utility District has referred to as the Mutual Company's "cuckoo bird theory" of seeking to appropriate water out of the Vail Reservoir and the allegedly proposed dam of the Fallbrook Public Utility District.

13. That the Santa Margarita Mutual Water Company is any more than a paper corporation claiming paper rights to the use of water, devoid of any structures or physical assets essential to effectuate the alleged plans.

14. That the defendants have facilities with which to divert from the Santa Margarita River or apply to a beneficial use the water for which they are claiming rights.

15. That either the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District have or are able to raise the funds requisite to construct the facilities which would be required to impound, divert, distribute or utilize the quantities of water for which they are asserting rights in the Santa Margarita River.

16. That the lands within the alleged service areas of the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District are susceptible of practicable or profitable irrigation.

17. That either the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District have plans for the impounding, diversion, distribution or utilization of water from the Santa Margarita River which are physically or economically feasible.

18. That either the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District can impound, divert, distribute or utilize water from the Santa Margarita River without encroaching upon or impairing the rights to the use of water owned by the United States of America and the subject matter of this litigation.

19. That the Fallbrook Public Utility District or the Santa Margarita Mutual Water Company could construct or operate a system for impounding, diverting or distributing the water for which they are claiming rights from the Santa Margarita River without financing from the Federal Government and asserts that no such funds are available.

20. That either the Santa Margarita Mutual Water Company or Fallbrook Public Utility District have in connection with any claims for which they are asserting rights to the use of water prosecuted the construction of their alleged projects with due diligence.

21. That there are 1,800 acres of land or any other acreage within the boundaries of the Fallbrook Public Utility District which are within the watershed of the Santa Margarita River or that any of the waters used by that District enter the watershed of the Santa Margarita River.

22. That the State of California has a property interest of any kind or character in the Santa Margarita River which is subject to determination or adjudication in this proceeding.

23. That the Santa Margarita Mutual Water Company has an established service area and the United States of America alleges that the service area which it claims conflicts with the service area of another corporation which claims the authority to

serve the same area or a part of the same area claimed by the defendant in question and further alleges that the defendant in question has yet to determine the area which it proposes to serve or the source of water upon which it will rely.

### Exhibits

U.S.A.—Plaintiff's Exhibit No. 1.

Letter, dated November 14, 1950, from Dan A. Kimball, then Acting Secretary of the Navy, requesting the Attorney General to take action to protect the rights of the United States of America in the Santa Margarita River.

U.S.A.—Plaintiff's Exhibit No. 2.

Map of the drainage area of the Santa Margarita River, disclosing the Santa Margarita River, Murrieta Creek, Temecula Creek and other affluents of the stream; the location of the military establishments involved in the litigation and the location of the Vail Properties.

U.S.A.—Plaintiff's Exhibit No. 3.

Climatological Data, California Section, U. S. Department of Commerce, Weather Bureau.

U.S.A.—Plaintiff's Exhibit No. 4.

Application of the Vail Company to appropriate waters of Temecula Creek, Application No. 11518 and the permit granted, and Permit No. 7032 granting the application for the construction of the dam for the Vail Reservoir.

U.S.A.—Plaintiff's Exhibit No. 5.

Capacity and area curve for Nigger Canyon (Vail) Reservoir.

U.S.A.—Plaintiff's Exhibit No. 6.

Vail Dam and Reservoir data; elevation, capacity and related information.

U.S.A.—Plaintiff's Exhibit No. 7.

Tabulation respecting the acre feet in Vail Lake from December 1948 to and including April, 1952.

U.S.A.—Plaintiff's Exhibit No. 8.

Map disclosing the geology of the Santa Margarita-Temecula River watershed, dated January 1952, Office of Ground Water Resources, Camp Pendleton, California.

U.S.A.—Plaintiff's Exhibit No. 9.

Profile of the Santa Margarita River, disclosing elevation and location of principal basins beneath Temecula Creek and Santa Margarita River, entitled "Geologic Cross Section A–A' along the Santa Margarita-Temecula River," dated 10 July 1952, Office of Ground Water Resources, Camp Pendleton, California.

U.S.A.—Plaintiff's Exhibit No. 10.

Map of lower Santa Margarita River Valley, Camp Joseph H. Pendleton, California, showing ground-water storage units, general geology, and location of wells and stream-gaging stations, compiled November 1951 by U.S.G.S.

U.S.A.—Plaintiff's Exhibit No. 11.

Geologic Section A–A' through the lower Santa Margarita River Valley, showing unconsolidated deposits and water-level profiles, United States Geologic Survey.

U.S.A.—Plaintiff's Exhibit No. 12.

Isopach map of alluvial deposits of a portion of the Santa Margarita River within Camp Joseph H. Pendleton, San Diego County, California, Office of Ground Water Resources, Camp Pendleton, dated March 20, 1952.

U.S.A.—Plaintiff's Exhibit No. 13.

Bar graph disclosing specific yield of materials of wells within the basin underlying Camp Joseph H. Pendleton by Office of Ground Water Resources, Camp Pendleton, dated March 1952.

U.S.A.—Plaintiff's Exhibit No. 14.

U. S. G. S. records, Water Supply Papers for the Santa Margarita River System.

U.S.A.—Plaintiff's Exhibit No. 15.

Certified copies of certain documents involved in the acquisition of the 9,147.55 acres of land more or less comprising the United States Naval Ammunition Depot.

U.S.A.—Plaintiff's Exhibit No. 16.

Certified copies of certain documents involved in the acquisition of the 123,620 acres of land more or less comprising Camp Joseph H. Pendleton Marine Corps Training Base and United States Naval Hospital.

U.S.A.—Plaintiff's Exhibit No. 17.

Certified copies of certain documents involved in the acquisition of the 1,676.58 acres of land more or less; 112.11 acres of land and 1574.61 acres of the public domain lands comprising part of Camp Joseph H. Pendleton.

U.S.A.—Plaintiff's Exhibit No. 18.

Letter of January 12, 1943 from James Forrestal, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over the United States Naval Ammunition Depot.

U.S.A.—Plaintiff's Exhibit No. 19.

Letter of September 8, 1943 from James Forrestal, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over Camp Joseph H. Pendleton and the United States Naval Hospital.

U.S.A.—Plaintiff's Exhibit No. 20.

Letter of February 18, 1944 from A. L. Gates, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over 1676.58 acres of land in connection with Camp Joseph H. Pendleton.

U.S.A.—Plaintiff's Exhibit No. 21.

Uncontrolled Mossic, Camp Pendleton, Calif. Photographed by Patrol Squadron 61—1951.

U.S.A.—Plaintiff's Exhibit No. 22.

Map disclosing location of all structures —United States Navy Hydrographic Office, map of Camp Joseph H. Pendleton, 1st Edition, March 1952.

U.S.A.—Plaintiff's Exhibit No. 23.

Land classification map of the Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton.

U.S.A.—Plaintiff's Exhibit No. 24.

Land utilization map of Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton.

U.S.A.—Plaintiff's Exhibit No. 25.

Soil survey field sheets, soil survey legend, of Camp Joseph H. Pendleton, dated June 1952.

U.S.A.—Plaintiff's Exhibit No. 26.

Tabulation in acre feet of water pumped at Camp Pendleton, entitled "Camp Pendleton Total Pumps, Camp Pendleton Records Diversions."

U.S.A.—Plaintiff's Exhibit No. 27.

Tabulation in acre feet of water pumped from Ysidora area for agricultural purposes, entitled "Ysidora Mesa Pumps, Camp Pendleton Records Diversions."

U.S.A.—Plaintiff's Exhibit No. 28.

Tabulation of monthly acre feet use of water for irrigation—Vail Ranch, entitled "Use of water for irrigation—Vail Ranch—from ranch records by H. M. Hall."

U.S.A.—Plaintiff's Exhibit No. 29.

Tabulation Lake O'Neill Reservoir storage records.

U.S.A.—Plaintiff's Exhibit No. 30.

Area and capacity curve of Lake O'Neill, Camp Joseph H. Pendleton, Public Works Office, P W drawing # 1167CP.

U.S.A.—Plaintiff's Exhibit No. 31.

Map of Pauba Ranch and vicinity, Riverside County, California.

U.S.A.—Plaintiff's Exhibit No. 32.

May of soil and climatic surveys of the Pauba Ranch, Riverside County, California.

U.S.A.—Plaintiff's Exhibit No. 33.

Tabulation and analysis in re crop adaptation of parts of Pauba, Temecula, Little Temecula and Santa Rosa Ranchos.

U.S.A.—Plaintiff's Exhibit No. 34.

Certified copy of Revocable License and Permit to use water from the Santa Margarita River from Rancho Santa Margarita to the Fallbrook Public Utility District; Letter of May 24, 1948 revoking it.

U.S.A.—Plaintiff's Exhibit No. 35.

Relief map from the office of Major General Oliver P. Smith will be used throughout for location and general reference. This map is entitled "Photo Surfaced Terrain Model 16 DP3, U. S. Marine Corps Reservation, Camp Joseph H. Pendleton, Oceanside, Calif." and was prepared January 1951 by U. S. Navy Special Devices Center, Port Washington, L. I., N. Y.

## Exhibits

### Fallbrook Public Utility District

Exhibit No. A—Organizational documents, including State of California certified statement as to current standing.

Exhibit No. B—Application No. 11586 to appropriate water.

Exhibit No. C—Permit No. 7033 signed by Edward Hyatt, State Engineer on February 18, 1948.

Exhibit No. D—Application No. 11587 to appropriate water.

Exhibit No. E—Permit No. 8511 signed by A. D. Edmonston, State Engineer on April 23, 1951.

Exhibit No. F—Application No. 12178 to appropriate water.

Exhibit No. G—Application No. 12179 to appropriate water.

Exhibit No. H—Application No. 12576 of United States of America to appropriate water.

Exhibit No. I—Statement of Records of Diversions of Water from Santa Margarita River.

Exhibit No. J—Statement of Records of Diversions of Water from the San Luis Rey River.

Exhibit No. K—Copies of records of San Diego County Water Authority of Colorado River Water sold to Fallbrook Public Utility District.

Exhibit No. L—Population tabulation.

### Exhibits

### Santa Margarita Mutual Water Company

Exhibit No. A—Organizational documents, including State of California certified statement as to current standing.

Exhibit No. B—Application No. 11578 to appropriate water.

Exhibit No. C—Application No. 12152 to appropriate water.

Exhibit No. D—Affidavit of publication of notice of application by the Fallbrook Enterprise.

Exhibit No. E—Notice of application and affidavit of publication in the Elsinore Valley Sun.

## General Stipulations

1. It is understood and agreed that the defendants or any of them, shall have the right to present other contentions in addition to those contained in this Order and to present responses to the contentions of the other party, if such be deemed desirable by that party. The same privilege will be accorded the United States.

2. It is understood and agreed between counsel for the Fallbrook Public Utility District, the Santa Margarita Mutual Water Company, the State of California and the United States of America that the United States of America has fee simple title to the lands comprising the military establishments (Camp Pendleton, United States Naval Ammunition Depot, United States Naval Hospital) and that a portion of the land are riparian in character but counsel for the defendants and the defendant in intervention do not agree in regard to the total or location of the riparian acreage claimed by the United States. It is likewise understood and agreed between counsel for the Fallbrook Public Utility District, the Santa Margarita Mutual Water Company, the State of California and the United States of America that the Vail Estate is the owner in fee simple title of lands located in the watershed of the Santa Margarita River some of which is riparian to that river but counsel for the defendants and the defendant in intervention do not agree in regard to the total or location of that riparian acreage.

3. Thirty days prior to trial, the Plaintiff will furnish the Defendants with a statement of the quantities of water which have been used by the United States of America and its predecessors in interest outside the watershed of the Santa Margarita River; the several places of use; the periods of time during which said water was so used and the purposes for which said water was used.

4. It is understood and agreed by and between the parties hereto that since all the exhibits have not yet been delivered to the respective parties, that as to each exhibit delivered, and to be delivered hereunder, when delivered, the party receiving

it reserves the right to object to the admissibility of the exhibit. Each of the parties shall have the right to dispute or question the truth, accuracy or correctness of any of the exhibits of another party or any of the figures, statements or representations therein contained and shall have the right to present evidence and exhibits to prove facts to the contrary to those contained in said exhibits or in addition thereto. Any party hereto shall have the right to demand the production in court of the person or persons who prepared any exhibits for cross-examination by giving the opposite party written notice within thirty days after receiving the exhibit.

5. The defendants by agreeing that the Court has jurisdiction of the above entitled action by reason of the express declaration of Congress do not concede that this Court has jurisdiction to pass on or adjudicate the legality or validity of any permit or license which may be issued by the Division of Water Resources of the State of California pursuant to the applications filed with said Division by the defendants either prior to or subsequent to the issuance of such permits or licenses. The United States asserts that this Court has jurisdiction to adjudicate the questions referred to in the preceding sentence.

### Definitions

1. The phrase "intermittent stream" as used herein is defined to mean a stream, the flow of which in the state of nature is interrupted either from time to time during the year or at various places along its course, or both.

2. The phrase "in the state of nature" as used herein with respect to natural streams or basins is defined to refer to a period of time before such streams or basins were affected by the activities of man.

3. The term "historically", as used herein, is defined to mean "at some time or times in the past."

United States of America

/s/ William H. Veeder
    William H. Veeder
      Special Assistant to the Attorney
      General

/s/ David W. Agnew
    David W. Agnew
      Attorney, Department of the Navy

Fallbrook Public Utility District

/s/ Phil D. Swing
    Phil D. Swing, Attorney for Fallbrook Public Utility District

Santa Margarita Mutual Water Company

/s/ W. B. Dennis
    W. B. Dennis, Attorney for Santa Margarita Mutual Water Company

State of California

/s/ Arvin B. Shaw, Jr.
    Arvin B. Shaw, Jr., Assistant Attorney General, for the State of California, Defendant in Intervention.